Rita Lynn BAKER, Plaintiff,

v.

JOHN MORRELL & CO., Defendant.

No. C01–4003–MWB.

United States District Court,
N.D. Iowa,
Western Division.

May 21, 2003.

Jay Elliot Denne, Stanley E. Munger, Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

Gary P. Thimsen, Melanie L. Carpenter, Woods, Fuller, Shultz & Smith, PC, Sioux Falls, SD, Leslie R. Stellman, Hodes, Ulman, Pessin & Katz, PA, Towson, MD, Scott C. Folkers, Scott Folkers Law Firm, Sioux Falls, SD, for Defendant.

MEMORANDUM OPINION AND OR-
DER REGARDING PLAINTIFF'S
MOTION FOR AMENDMENT OF
JUDGMENT AND APPLICATION
FOR ATTORNEY'S FEES

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ..................................... 1168

II. ANALYSIS ......................................................... 1169
 A. Prospective Equitable Relief Available Under Title VII ................... 1169
 B. Baker's Request For Prospective Equitable Relief ...................... 1170
 1. Reinstatement ............................................ 1170
 2. Front Pay ............................................... 1175
 3. Calculation of the front pay award ......................... 1184
 C. Plaintiff's Request for Attorney's Fees ............................. 1187
 1. Applicable standards ...................................... 1188
 2. Reasonable hourly rate .................................... 1189
 3. Hours reasonably expended ................................ 1195
 4. Partial success .......................................... 1199
 5. Calculation of attorney fee award ......................... 1202
 D. Recoverable Costs and Expenses ................................... 1202

III. CONCLUSION ...................................................... 1208

## I. INTRODUCTION AND BACKGROUND

This action arose out of Rita Baker's ("Baker") claim that her long-time employer, John Morrell, maintained a hostile work environment and retaliated against her for complaining about that environment and subjected her to disparate treatment. From 1984 until 2002, Baker worked on the plant floor at John Morrell, and, at the time of her constructive discharge, she was a Computer Scale Operator in the defendant's Sioux City, Iowa meat packaging plant. At trial, she alleged that she was constructively discharged, subjected to disparate treatment and a sexually hostile work environment, and retaliated against for challenging the sexual discrimination she endured at John Morrell—all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

The case was tried to a jury for seven days, beginning on September 23, 2002. The case was submitted to the jury in the late afternoon of October 1, 2002. The following afternoon, on October 2, 2002, the jury returned its verdict. It found in favor of Baker on her claims of sexual harassment and retaliation. The jury also found on both of these claims that Baker was constructively discharged, and, pertinent to her retaliation claim, the jury found that John Morrell had failed to prove its "same decision" defense. On Baker's claim of disparate treatment, the jury found in favor of John Morrell.

In a separate Order dated March 17, 2003, the court disposed of several post-trial motions, including the defendant's motions for judgment as a matter of law and for new trial and the plaintiff's motion to amend complaint. Presently before the court is the plaintiff's Motion for Amendment of Judgment, in which she seeks an

award of front pay, and Application for Attorney's Fees.

The court held a post-verdict evidentiary hearing on April 2, 2003 in order to re-open the record so that Baker could present evidence concerning front pay calculations and so that she could supplement the record on her request for fees. At this hearing, the plaintiff was represented by Stanley Munger and Jay Denne of Munger, Reinschmidt & Denne, Sioux City, Iowa. The defendant was represented by Leslie Stellman of Hodes, Ulman, Pessin & Katz, P.A., Towson, Maryland, and by Scott Folkers, in-house counsel for John Morrell in Sioux Falls, South Dakota.

Both parties presented evidence at this hearing. In support of her request for front pay, Baker presented her own testimony as well as various tax forms. John Morrell presented the testimony of a representative from Iowa Workforce Development, which is a state job placement agency. After the hearing, the parties submitted briefs in which they summarized their view of the evidence and of applicable law.

John Morrell has not timely argued that reinstatement would be appropriate. Neither has John Morrell timely argued that attorney's fees would be improper in this case.[1] However, it has timely challenged the amount of Baker's request for both front pay and attorney's fees.

The court will first consider Baker's request for front pay, beginning with a succinct review of the prospective equitable remedies available under Title VII. Next, the court will consider which future equitable remedies—if any—should be awarded to Baker in this case. And finally, the court will consider Baker's request for attorney's fees, costs, and expenses.

## II. ANALYSIS

### A. Prospective Equitable Relief Available Under Title VII

■ Title VII, like other federal anti-discrimination laws, supplies broad legal and equitable remedies to make successful plaintiffs whole.[2] 42 U.S.C. § 2000e–5; *see also McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 357–58, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) (discussing various federal anti-discrimination laws and the means of relief available); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (stating that "[t]he 'make whole' purpose of Title VII is made evident by the legislative history."); *Cowan v. Strafford R–VI Sch. Dist.*, 140 F.3d 1153, 1160 (8th Cir. 1998) (acknowledging the court's obligation "to fulfill the make-whole purposes of Title

---

1. At no time prior to John Morrell's April 15, 2003 Supplemental Brief in Resistance to Plaintiff's Motion to Alter or Amend Judgment (Doc. No. 201) did John Morrell argue that reinstatement is the more appropriate prospective remedy. As such, John Morrell's argument is untimely and not properly before the court. *Canady v. John Morrell & Co.*, 247 F.Supp.2d 1107, 1115 n. 3 (N.D.Iowa 2003); *cf. Wiener v. Eastern Ark. Planting Co.*, 975 F.2d 1350, 1357 n. 6 (8th Cir.1992) ("We generally decline to consider issues raised for the first time in reply briefs, and there is no adequate reason to deviate from that rule in this case.") (internal citation omitted). Even so, for the reasons articulated in the body of

this Order, the court finds that reinstatement is not an appropriate remedy in this case.

2. Title VII of the Civil Rights Act of 1964 was amended by the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071. *Caviness v. Nucor–Yamato Steel Co.*, 105 F.3d 1216, 1218 (8th Cir.1997). Prior to the 1991 amendments, only equitable relief was available under the Act. *Id.* "Section 102 of the 1991 Act, however, now makes it possible for a successful plaintiff 'to recover compensatory and punitive damages for certain violations of Title VII.'" *Id.* (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 247, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

VII"). Among the myriad of remedies available to individuals who prevail on their claims of employment discrimination are two alternative types of equitable prospective relief: reinstatement and front pay.[3] *Newhouse v. McCormick & Co.*, 110 F.3d 635, 641 (8th Cir.1997). These equitable remedies may be awarded to compensate successful plaintiffs for lost future earnings. *Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823, 832–33 (3d Cir.1994).

The purpose of and method for calculating these equitable remedies have been characterized in largely the same manner whether relief is sought under Title VII, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, (ADEA), or the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (ADA). *Lussier v. Runyon*, 50 F.3d 1103, 1107–08 (1st Cir. 1995). The choice of which prospective equitable remedy, if either, should be awarded in a given case is committed to the sound discretion of the trial court. *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir.1998); *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1458 (10th Cir. 1997); *Suggs v. ServiceMaster Educ. Food Management*, 72 F.3d 1228, 1234 (6th Cir. 1996); *Standley v. Chilhowee R–IV Sch. Dist.*, 5 F.3d 319, 322 (8th Cir.1993); *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir.1990).

In *Ogden v. Wax Works, Inc.*, 29 F.Supp.2d 1003, 1008–15 (N.D.Iowa 1998), *aff'd*, 214 F.3d 999 (8th Cir.2000), this court provided a comprehensive examination of reinstatement and front pay as remedies for prospective equitable relief available under Title VII, as well as examined the factors considered in ordering reinstatement and in awarding front pay. *Id.* The court, therefore, will not expound upon those remedies and factors extensively here. Rather, the court will address the remedies and apply the factors that it enumerated in *Ogden* in conjunction with Baker's request for front pay.

## B. Baker's Request For Prospective Equitable Relief

Baker has requested prospective equitable relief in the form of front pay. The starting point for the court's analysis of this request is a consideration of whether the "preferred" remedy of reinstatement is appropriate in this case. *See Newhouse,* 110 F.3d at 641; *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir.1988).

### 1. Reinstatement

Baker contends that an award of front pay, as opposed to reinstatement, is the appropriate remedy in this case. John Morrell did not address whether it considers reinstatement to be a viable option in this case until its supplemental brief filed after the post-verdict hearing. However, John Morrell's only timely argument concerning whether or not front pay is appropriate in this case is this: Baker is not entitled to an award of front pay because she failed to mitigate her damages by, after she was constructively discharged from John Morrell, choosing to embark on a career at a nursing home facility, which offered much lower pay. John Morrell contends that an award of front pay would effectively be "subsidizing" Baker's choice to seek work in a lower paying position

---

**3.** The United States Court of Appeals for the First Circuit apparently takes issue with the characterization of reinstatement and front pay as "alternative" remedies. In *Selgas v. American Airlines, Inc.*, 104 F.3d 9, 13 (1st Cir.1997), the court explained that these remedies are not mutually exclusive because "[f]ront pay takes a plaintiff to the point of employability. Reinstatement at that point would, in effect, 'perfect' the remedy because the plaintiff would be back in the very job she lost unlawfully."

because she did not seek employment at any other similar manufacturing plants.

■ Before the court may consider the propriety of a front pay award, it must be assured that reinstatement is an infeasible or otherwise inappropriate remedy. *See Williams. v. Valentec Kisco, Inc.,* 964 F.2d 723, 730 (8th Cir.1992) (remanding issue of front pay and reminding magistrate judge that front pay should not be awarded "unless reinstatement is impossible or impracticable. . . .") (quoting *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 616 (1st Cir. 1985)). In *Ogden,* this court identified the following factors that are potentially useful in determining whether reinstatement is an appropriate remedy:

> (1) whether the employer is still in business, *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1423 (4th Cir.1991); (2) whether there is a comparable position available for the plaintiff to assume, *Roush v. KFC Nat'l Management Co.,* 10 F.3d 392, 398 (6th Cir.1993), *cert. denied,* 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994); *Duke,* 928 F.2d at 1423; (3) whether an innocent employee would be displaced by reinstatement, *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1254 (5th Cir.1995); *Roush,* 10 F.3d at 398; *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1370–71 (7th Cir.1992); (4) whether the parties agree that reinstatement is a viable remedy, *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; (5) whether the degree of hostility or animosity between the parties—caused not only by the underlying offense but also by the litigation process—would undermine reinstatement, *Cowan,* 140 F.3d at 1160; *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Standley,* 5 F.3d at 322; *McKnight,* 973 F.2d at 1370–71; *Lewis v. Federal Prison Indus., Inc.,* 953 F.2d 1277, 1280 (11th Cir.1992) (citation omitted); *Duke,* 928 F.2d at 1423; (6) whether reinstatement would arouse hostility in the workplace, *Cowan,* 140 F.3d at 1160; *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Standley,* 5 F.3d at 322; *McKnight,* 973 F.2d at 1370–71; *Lewis,* 953 F.2d at 1280; *Duke,* 928 F.2d at 1423; (7) whether the plaintiff has since acquired similar work, *Roush,* 10 F.3d at 398; (8) whether the plaintiff's career goals have changed since the unlawful termination, *McKnight,* 973 F.2d at 1370–71; and (9) whether the plaintiff has the ability to return to work for the defendant employer—including consideration of the effect of the dismissal on the plaintiff's self-worth, *Newhouse,* 110 F.3d at 641; *Lewis,* 953 F.2d at 1280.

*Ogden,* 29 F.Supp.2d at 1010.

*Factors (1)—employer still in business; (2)—comparable position available*

■ The first factor in the analysis, John Morrell's continuation in business, weighs in favor of reinstatement. This is so because the court finds that John Morrell continues to operate the Sioux City plant where Baker was employed as a computer scale operator. *See Duke,* 928 F.2d at 1423.

The second factor—the availability of a comparable position—is a negative factor against reinstatement because neither party offered evidence at the evidentiary hearing on whether or not John Morrell still had scale operator positions open. Moreover, based on the fact Baker testified that she had to bid for the scale operator position for many years before obtaining it, chances are unlikely that the position is still available. *See Roush,* 10 F.3d at 398; *Duke,* 928 F.2d at 1423.

*Factor (3)—displacement of innocent employees*

The third factor—the displacement of innocent employees—is likewise a negative

factor weighing against reinstatement because of the absence of evidence presented on this issue. Given that John Morrell is a unionized plant and that Baker spent so many years bidding into the computer scale operator position, ordering reinstatement would in all likelihood displace innocent employees who had bid into the scale operator position when the position came open after Baker was constructively discharged.

### Factor (4)—whether the parties agree that reinstatement is a viable remedy

The fourth factor—whether the parties agree that reinstatement is a viable remedy—is likewise a negative consideration. *See Ray*, 51 F.3d at 1254; *Roush*, 10 F.3d at 398; *Best v. Shell Oil Co.*, 4 F.Supp.2d 770, 777 (N.D.Ill.1998) (turning directly to the issue of front pay after acknowledging the parties' agreement that reinstatement was not appropriate). Apparently, at least until the post-verdict hearing, the parties agreed that reinstatement was not a viable remedy in this case. Generally, because the parties are in the best position to gauge the feasibility or practicality of the remedy of reinstatement, the court defers to their mutual belief that reinstatement is not appropriate in each case.

In this case, the defendant has raised an untimely argument that reinstatement is the proper remedy. The court simply declines to place any weight on John Morrell's argument that reinstatement is appropriate because it comes too late and is, in fact, a switch in its previous position. In any event, and as will be discussed in more detail below, John Morrell's assertion that Baker could return to John Morrell borders on absurd, given the severe emotional damage that John Morrell's conduct and the hostile environment inflicted on her psychological well-being.

### Factor (5)—hostility between the parties

The fifth factor concerns the hostility caused by the underlying events as well as the attendant litigation. *See Cowan*, 140 F.3d at 1160; *Ray*, 51 F.3d at 1254; *Roush*, 10 F.3d at 398; *Standley*, 5 F.3d at 322; *McKnight*, 973 F.2d at 1370–71; *Lewis*, 953 F.2d at 1280; *Duke*, 928 F.2d at 1423. Here, there can be no question that the events underlying Baker's claims of sexual hostile work environment and sex discrimination have resulted in a substantial degree of hostility between the parties. This is so particularly with respect to Baker's former harassers at John Morrell.[4] For instance, after she instituted formal complaints against John Morrell, there was evidence at trial that she was mocked for doing so and that one harasser, Brian Murphy, negatively analogized Baker's complaints to the O.J. Simpson trial. The court is confident in concluding that Baker would not enjoy the respect of her coemployees and some members of John Mor-

---

4. Neither party directly addressed the issue at the post-verdict hearing, but John Morrell stated in its supplemental post-verdict brief that her harassers were no longer in the workplace. (Doc. No. 201, at 2). In her supplemental brief, Baker notes that Jeff Eichmann had been terminated. Assuming this evidence is properly before the court since it did not come in through testimony or any other evidence presented at the post-verdict hearing, the court cannot find as a matter of fact that *all* of Baker's harassers at John Morrell are no longer in the workplace. Tes-

timony indicated that Kathi Brown–Rowley, Baker's former supervisor, was still a John Morrell employee, and her conduct contributed significantly to the hostile work environment endured by Baker. Moreover, a large part of the hostile work environment John Morrell maintained was part and parcel of the discriminatory plant-wide animus against women and their role on the plant floor, and there was absolutely no evidence that, apart from terminating Eichmann, John Morrell has taken steps to remedy the plant-wide atmosphere of discrimination.

rell management, particularly her former supervisor, Kathi Brown–Rowley.

The court recognizes that other members of management would exert considerable effort to welcome Baker and, at least superficially, to ensure that she was not subjected to hostility. Namely, Steve Joyce, the Human Resources Director, was part of the hostile work environment at John Morrell, but, at trial, he demonstrated genuine concern for Baker and showed his desire to see her succeed. Still, the evidence shows that, in spite of Joyce, the hostility at John Morrell would more likely than not continue, as it had for years prior to Baker's constructive discharge. The considerable hostility in this case among coworkers and some members of management suggests the impropriety of reinstatement and convinces the court that a productive working relationship between these parties would be impossible.

Furthermore, assuming that Baker's principal harassers are no longer John Morrell employees, Baker has been so emotionally damaged by the harassment she endured at John Morrell that it would be unjust and insensitive to place her back in the workplace. Consideration of Baker's ability to return to John Morrell will be more fully discussed in Factor 9, *infra*, but her continued emotional distress and the exacerbation of it that returning to John Morrell would cause are relevant to this factor as well and weigh significantly against reinstatement.

*Factors (6)—hostility in workplace; (7)—plaintiff's acquisition of similar work, and (8)—change in plaintiff's career goals*

The court is mindful that factors such as whether reinstatement would arouse hostility in the workplace, *see, e.g., Cowan,* 140 F.3d at 1160; whether the plaintiff has acquired similar work, *Roush,* 10 F.3d at 398; and whether the plaintiff's career goals have changed since the unlawful termination, *McKnight,* 973 F.2d at 1370–71; may be relevant to the determination of the propriety of reinstatement. However, the court has reviewed the record in this case and finds that these factors weigh against reinstatement.

There was *considerable* evidence regarding the hostility between Baker and her co-workers. This hostility was not isolated to her main harassers, Jeff Eichmann and Brian Murphy. The court concludes that there is a basis from which to infer that Baker's return would in all likelihood arouse hostility at John Morrell. Moreover, there is also a significant evidentiary basis to conclude that there is a high likelihood, based on John Morrell's history of failing to remedy Baker's complaints, that the harassment would begin anew were Baker to be reinstated. The court, therefore, finds this factor to weigh against reinstatement. The court also finds that Baker has not acquired similar work, because Baker is now employed as a certified nurse assistant at a health care facility. Therefore, this factor weighs against reinstatement.

Finally, there was evidence regarding a change in Baker's career goals since her termination. After leaving John Morrell, Baker became certified as a certified nurse assistant ("CNA") and is enjoying her new fulfilling career. She credibly testified at trial and during the post-verdict evidentiary hearing that she would not have realized this change in her career path but for the emotional turmoil and depression that she suffered as a result of the sexual discrimination inflicted by John Morrell. Moreover, she did not change career paths until she was discharged. She testified at the evidentiary hearing that she considers her job as a nurse to be much more fulfilling than her computer scale operator position, but she would have remained at John

Morrell until she retired were it not for the discrimination.

In *McKnight v. General Motors Corp.*, 973 F.2d 1366 (7th Cir.1992), the appellate court affirmed the district court's decision not to order reinstatement, in part, because the Title VII plaintiff did not want to return to his former position as a manufacturing plant supervisor because his career goals had changed. *Id.* at. The district court reasoned:

> Given Mr. McKnight's unequivocal desire to be in an entirely different field, reinstatement to his former position is not desirable or realistic. Mr. McKnight could be reinstated to his former position as a manufacturing supervisor. Would the purposes of Title VII be advanced by such an order? I think not. Mr. McKnight's career goals and aspirations, as presented by his testimony at trial and through his experts, no longer include supervising the manufacture of automobile parts. He wants to be in the financial services industry. Title VII would not be served by placing the plaintiff in a job he does not want. Such a situation would likely cause Mr. McKnight to suffer again from emotional distress. This type of reaction "would ensue independently of any hostility or retaliation by the employer."

*McKnight v. General Motors Corp.*, 768 F.Supp. 675, 680 (E.D.Wis.1991) (citations omitted), *aff'd*, 973 F.2d 1366 (7th Cir. 1992).

In *McKnight*, the change in the plaintiff's career goals weighed against reinstatement. Moreover, front pay was not appropriate in *McKnight* because the plaintiff's new career was a higher paying one. The facts of Baker's case counseling against reinstatement are more compelling than in *McKnight* because it was John Morrell's discriminatory conduct that prompted Baker's career change. In *McKnight*, the plaintiff simply did not want to work in the manufacturing field. *Id.* Based on Baker's testimony and on the fact she had continuously worked for John Morrell since 1984 and was the third most senior woman in the company, the court finds that, absent sex discrimination, she would have remained a John Morrell employee and would not have sought work in another career field. Thus, contrary to John Morrell's assertion that an award of front pay would subsidize Baker's choice to pursue a lower paying career, consideration of this factor counsels against reinstatement because reinstatement would not further the objectives of Title VII under these circumstances and because John Morrell's conduct caused Baker's shift in career goals.

### Factor (9)—plaintiff's ability to return to work for employer

Perhaps the strongest factor disfavoring reinstatement in this case is the ninth factor—the plaintiff's ability to return to work for John Morrell. *See Newhouse,* 110 F.3d at 641; *Lewis,* 953 F.2d at 1280. Baker testified at length during trial to the devastating toll that the discrimination at John Morrell took on her self-esteem, on her self-worth, and on her physical and mental well-being. She suffered from severe depression, anxiety attacks, sleeplessness, mental breakdowns, weight loss, and she ultimately attempted suicide. This testimony was supported by the testimony of Baker's treating physician, Dr. Muller, as well as by the testimony of her psychiatrist, Dr. Jennings. Under the circumstances of this case, the court finds this factor to be particularly important. The court finds that Baker has suffered a devastating blow to her self-worth, to her self-esteem, physical and mental well-being aggravated by the actions of John Morrell. Reinstatement under these conditions would be counter-productive to John Morrell and an empty remedy to Baker.

Having reviewed the evidence presented both at trial and during the post-verdict evidentiary hearing, the court is left with the exceedingly firm conviction that reinstatement is not an appropriate remedy in this case. The court will, therefore, turn to Baker's request for front pay.

### 2. Front Pay

■■■ "An equitable award of front pay is generally appropriate when reinstatement must be denied." *United Paperworkers Internat'l Union, AFL–CIO, Local 274 v. Champion Internat'l Corp.*, 81 F.3d 798, 805 (8th Cir.1996) (citing *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 730 (8th Cir.1992)). Baker seeks front pay in the amount of $170,751.40. After being constructively discharged from her employment with John Morrell, Baker worked for a nursing home, Oak Park Care Center, in Sheldon, Iowa. She worked in Sheldon from the time she was constructively discharged in February of 2002 until December of 2002. While employed at Oak Park Care Center, Baker completed training and earned her certification as a CNA. As a CNA at Oak Park Care Center, Baker earned an hourly wage of $8.51, worked full-time, and had benefits.

Baker's brother suffers from muscular dystrophy, and he had moved to Sheldon with Baker so that she could care for him. However, in October of 2002, he became "homesick," and he returned to Sioux City. Baker followed shortly thereafter and left Sheldon in December of 2002. Baker applied at several care facilities in the Sioux City, Iowa area but was unable to begin working until April 1, 2003. Even though her current employer hired Baker in February of 2003, she did not receive approval to work in a health care facility from the State of Iowa until April 1, 2003. Currently, she works part-time as a CNA at Countryside Senior Living and earns $9.00/hour. She is not yet eligible to receive benefits at Countryside Senior Living. If Baker were still employed by John Morrell, she would be earning $11.45/hour, plus benefits.

Baker arrived at the front pay sum of $170,751.40, in part, by assuming that her employer, Countryside Senior Living, will not be able to accommodate her desire to work full-time (40 hours/week) until she has worked there at least three years. As part of her initial training period, which lasts three weeks, Baker will work 3 days/week. After this training period ends, she will work every other weekend. However, Baker articulated her desire to work full-time to her employer, and she is "very hopeful" that her current position will eventually become full-time.

Until such time, Baker assumes that she will be able to progressively pick up open shifts during the week. From May until September of 2003, she estimates that she will be able to work one extra day/week. From October of 2003 through March of 2004, Baker believes she will be able to pick up 2 extra days/week of work. Thus, by October of this year, Baker estimates that she will be working 12 days/month, or 96 hours/month.

Baker is also not currently eligible for benefits with her current employer. She testified at the evidentiary hearing that Countryside Senior Living employees are not eligible for benefits until they work 36 hours/week. While Baker asserts in her front-pay calculation exhibit [Pf.'s exh. 12] that she does not believe she will be eligible to receive benefits until she has worked at Countryside Senior Living for three years, she testified at the evidentiary hearing that she will be "basically full-time" in April of 2004. In any event, as part of her front pay calculation, she seeks to recover the dollar value of benefits she would have earned at John Morrell until she receives benefits from her current em-

ployer. She estimates the dollar value of these benefits at $300/month.

Also factored also into Baker's front pay calculation is the assumption that Baker, currently 44 years of age, still has twenty years to contribute to the workforce before retiring. In short, Baker asserts that her lost wages are $159,951.40, and when combined with her lost fringe benefits of $10,800.00, the total is $170,751.40.

As with the analysis regarding reinstatement, the court will consider factors traditionally approved by other courts in a front pay determination. The court will, therefore, consider the following factors that it enumerated in *Ogden:*

(1) the plaintiff's age, *Barbour* [*v. Merrill* ], 48 F.3d [1270] at 1280 [ (D.C.Cir. 1995) ]; (2) the length of time the plaintiff was employed by the defendant employer, *Standley,* 5 F.3d at 322; (3) the likelihood the employment would have continued absent the discrimination, *Barbour,* 48 F.3d at 1280; *Standley,* 5 F.3d at 322; (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment, *Paolella v. Browning–Ferris, Inc.,* 158 F.3d 183, 194–95 n. 13 (3d Cir.1998); *Kelley* [*v. Airborne Freight Corp.*], 140 F.3d [335] at 355 n. 12[ (1st Cir.1998) ]; *HBE Corp.,* 135 F.3d at 555; *Downes v. Volkswagen of Am., Inc.,* 41 F.3d 1132, 1141 n. 8 (7th Cir.1994); *Roush,* 10 F.3d at 399; *Standley,* 5 F.3d at 322; *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281, 286 (8th Cir.1993); *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1160 (6th Cir.1985); (5) the plaintiff's work and life expectancy, *Paolella,* 158 F.3d at 194–95 n. 13; *Downes,* 41 F.3d at 1141; *Roush,* 10 F.3d at 399; *Shore,* 777 F.2d at 1160; (6) the plaintiff's status as an at-will-employee, *Barbour,* 48 F.3d at 1280; *Schwartz v. Gregori,* 45 F.3d 1017, 1023 (6th Cir.), *cert. denied,*

516 U.S. 819, 116 S.Ct. 77, 133 L.Ed.2d 36, (1995); (7) the length of time other employees typically held the position lost, *Barbour,* 48 F.3d at 1280; (8) the plaintiff's ability to work, *Lewis v. Federal Prison Indus. Inc.,* 953 F.2d 1277, 1281 (11th Cir.1992); *Ortiz v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 852 F.2d 383, 387 (9th Cir.1987); (9) the plaintiff's ability to work for the defendant-employer, *Id.;* (10) the employee's efforts to mitigate damages, *Paolella,* 158 F.3d at 194–95 n. 13; *Barbour,* 48 F.3d at 1280; *Downes,* 41 F.3d at 1141; *Roush,* 10 F.3d at 399; *Shore,* 777 F.2d at 1160; and (11) the amount of any liquidated or punitive damage award made to the plaintiff, *Hadley v. VAM P T S,* 44 F.3d 372, 376 (5th Cir.1995); *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1056 (7th Cir.1990); *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 616 (1st Cir.1985). *Ogden,* 29 F.Supp.2d at 1015.

### Factor (1)—plaintiff's age

The first factor in the analysis is a consideration of the plaintiff's age. *See Barbour,* 48 F.3d at 1280. At the time of the post-verdict hearing, Baker was forty-four (44) years old. In *United Paperworkers International Union, AFL–CIO, Local 274 v. Champion International Corp.,* 81 F.3d 798, 805 (8th Cir.1996), the plaintiff was awarded front pay for twenty-four years, a time period which was intended to follow the plaintiff until he reached retirement age. The Court of Appeals for the Eighth Circuit did not rule directly on the issue because it reversed the district court's denial of the defendant's motion for new trial, but it strongly indicated it would not approve of such a lengthy front pay award because the duration of the award was improperly speculative. *Id.* The court explained that "[a]n award of front pay until retirement ignores the plaintiff's duty to mitigate damages and the district court's

corresponding obligation to estimate the financial impact of future mitigation. Instead of warranting a lifetime of front pay, [the plaintiff's] relatively young age should improve his future opportunities to mitigate through other employment." *Id.* (citing *Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1258 (2d Cir.1987)) (internal citation omitted).

Like the plaintiff in *United Paperworkers International,* Baker is relatively young in terms of her expected participation in the labor market. Her age, however, does not counsel against an award of front pay but rather counsels against a lengthy award. The court concludes that Baker's age is a neutral factor and is more pertinent to consideration of the duration of such an award than it is to consideration of whether an award of front pay is warranted.

### Factor (2)—length of employment

The evidence reveals that Baker was employed by John Morrell for approximately seventeen years. Moreover, she was the third most senior female employee at John Morrell. The court finds that the longevity of Baker's employment with John Morrell weighs in favor of a front pay award. *See Standley,* 5 F.3d at 322.

### Factors (3)—likelihood plaintiff would have remained in her position; and (6)—plaintiff's status as an at-will-employee

The court recognizes that Baker was an at-will-employee. However, the court finds that absent the sexual hostile work environment and discrimination, it is highly likely Baker would have remained in her position at John Morrell until she retired. Although this factor is subject to some speculation, *see Barbour,* 48 F.3d at 1280; *Standley,* 5 F.3d at 322, in this case, the level of speculation is almost non-existent and subject only to the general uncertainties of life. That is so because any speculation is significantly reduced by Baker's

seniority and by a strong and positive work history while employed at John Morrell. There is no evidence to suggest that John Morrell was unhappy with Baker's performance or otherwise contemplated or desired her departure. Moreover, the undisputed evidence in the record indicates that Baker found her position as a computer scale operator at John Morrell to be enjoyable. Again, this factor indicates an award of front pay is appropriate. *See Barbour,* 48 F.3d at 1280; *Schwartz,* 45 F.3d at 1023.

### Factor (4)—length of time necessary to secure comparable employment

Baker is currently employed as a CNA. Given (1) her relatively high hourly wage at John Morrell, (2) that she would probably never gain comparable employment because of her lack of education and a specialized skill, and (3) that it took Baker seventeen years in the production field to reach the level of earning she enjoyed at John Morrell, the court is persuaded that Baker would not have been able to find a job that paid as well as her computer scale operator position.

At the post-verdict evidentiary hearing, John Morrell elicited testimony from an employee of the Iowa Workforce Development to testify regarding job vacancies in the production field and CNA positions. Only one job paid as much as or more than Baker earned at John Morrell, and the likelihood of obtaining that job was minuscule. The position was highly competitive and demanded skills that Baker did not possess. More specifically, three night-shift production positions were open from December of 2002 until March of 2003 at the Cargill Soybean plant in Sioux City, Iowa and paid $14.77/hour. Applicants for these positions were required to have mechanical knowledge, which Baker does not possess. Moreover, there were 207 applicants for these three positions. The other

production positions offered by John Morrell at the evidentiary hearing paid substantially less than Baker earned while at John Morrell and were, most often, night-shift jobs only.[5]

As a matter of fact, the court finds that John Morrell failed to show that there was comparable available work, either at the time Baker accepted employment at Oak Park Care Center or when she moved back to Sioux City.[6] The unavailability of comparable work supports an award of front pay. *See Paolella,* 158 F.3d at 194–95 n. 13; *Kelley,* 140 F.3d at 355 n. 12; *HBE Corp.,* 135 F.3d at 555; *Downes,* 41 F.3d at 1141; *Roush,* 10 F.3d at 399; *Standley,* 5 F.3d at 322.

***Factors (5)—plaintiff's work and life expectancy; and (7)—the length of time other employees typically held the position lost***

The court finds that the fifth factor—Baker's life and work expectancy, *see Paolella,* 158 F.3d at 194–95 n. 13—are neutral considerations in the front pay analysis. Baker testified that she assumed she would work until age sixty-five. She is currently forty-four. The court takes judicial notice that the current life expectancy of a woman is 79.5 years. < http://www.cdc.gov/nchs/fastats/lifexpec. htm >.

The court, likewise, finds the seventh factor—the length of time other employees typically hold the position Baker lost, *see Barbour,* 48 F.3d at 1280—to be neutral in the front pay analysis. No evidence was presented regarding the length of time other employees typically hold the position Baker lost. Regarding this factor, the court is unwilling to speculate and, therefore, considers it to be a neutral consider-

ation in the determination of the front pay award.

***Factors (8)—ability to return to full-time work; and (9)—ability to return to work for defendant-employer***

The court also finds that, even though Baker is able to work full-time at another factory, under no circumstances is she physically, mentally, or emotionally capable of returning to work for John Morrell—even if such an opportunity were presented. *See Lewis,* 953 F.2d at 1281; *Ortiz,* 852 F.2d at 387; *Eivins v. Adventist Health System/Eastern & Middle Am., Inc.,* 660 F.Supp. 1255, 1263 (D.Kan.1987). In *Lewis v. Federal Prison Industries, Inc.,* 953 F.2d 1277, 1281 (11th Cir.1992), the Eleventh Circuit Court of Appeals was faced with an employment discrimination plaintiff who suffered from severe emotional trauma because of discrimination, much like Baker. In that case, the plaintiff rejected the employer-defendant's offer of reinstatement and nevertheless sought an award of front pay. *Id.* The court agreed that front pay was appropriate under the facts of the case, reasoning,

> For our purposes today, however, the most important factor remains the evidence adduced at trial that the discrimination endured by Lewis in effect *disabled* him. We note in this regard that the Ninth Circuit has recently approved front pay as a remedy where " . . . there is evidence from a mental health practitioner and doctors that [claimant] could not work at all or, as one said, should never work at any branch of the [employer] again." *Ortiz v. Bank of America National Trust and Savings Association,* 852 F.2d 383, 387 (9th Cir.1988). In this case, the uncontradicted evidence

---

5. Baker spent nine years at John Morrell bidding into her former position as a computer scale operator on the daytime shift.

6. This finding will be developed more fully in the court's consideration of whether Baker mitigated her damages, Factor 10.

showed that Lewis could not return to his former work environment without suffering a return of the symptoms that so debilitated him in the first place. *Id.*

In Baker's case, the evidence is clear and indisputable that her mental health condition precludes her from returning to John Morrell. She testified at the evidentiary hearing that even encountering former employees in the grocery store makes her uncomfortable and tense. Baker's doctors agreed that returning to work at John Morrell is simply not feasible. Thus, while Baker can work full-time outside of John Morrell and, in fact, is actively attempting to find full-time employment, she cannot return to John Morrell. These factors, therefore, counsel strongly in favor of an award of front pay.

### Factor (10)—plaintiff's effort to mitigate damages

■ "A Title VII claimant seeking either back pay or front pay damages has a duty to mitigate those damages by exercising reasonable diligence to locate other suitable employment and maintain a suitable job once it is located. *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir.1992). The burden of proving that the employee did not make reasonable efforts is on the defendant. *Di Salvo v. Chamber of Commerce*, 568 F.2d 593, 598 (8th Cir.1978)." *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir.1999); *accord Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1045 (5th Cir.1998); *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir.1995). "In carrying such [a] burden ... the defendant must show more than that there were steps towards finding comparable employment other than those [the claimant] took; it must 'show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment.' " *Reilly v. Cisneros*, 835 F.Supp. 96, 99 (W.D.N.Y.1993), *aff'd*,

44 F.3d 140 (2d Cir.1995) (quoting *E.E.O.C. v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 925 (S.D.N.Y.1976), *aff'd*, 559 F.2d 1203 (2d Cir.1977)).

■ The burden on the plaintiff to show she mitigated her damages is less demanding. "Wrongfully discharged claimants must use reasonable efforts to mitigate their damages, *see, e.g., Fiedler v. Indianhead Truck Line, Inc.*, 670 F.2d 806, 809 (8th Cir.1982), but this burden is not onerous and does not require success. *See, e.g., Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983) (reasonable diligence standard), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). All that is required by law is an honest, good faith effort. *E.g., United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 938 (10th Cir.1979)." *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir.1988). "[A] plaintiff may satisfy the 'reasonable diligence' requirement by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 865 (3d Cir. 1995) (citing *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); *Ford v. Nicks*, 866 F.2d 865, 873 (6th Cir.1989)). "In general, a plaintiff fails to mitigate adequately and therefore is [not] entitled to ... front pay 'to the extent he [or she] fails to remain in the labor market, fails to accept substantially similar employment, fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason.' " *Reilly*, 835 F.Supp. at 99 (quoting *N.L.R.B. v. Madison Courier, Inc.*, 472 F.2d 1307, 1317 (D.C.Cir.1972)).

■ When a claimant has rejected an offer of employment, the employer must prove that the offered position was sub-

stantially similar—a showing which involves demonstrating that the offered position affords "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the former position." *Reilly*, 835 F.Supp. at 100; *accord Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir.1990) ("Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated.").

In this case, John Morrell argues that Baker is not entitled to an award of front pay because she failed to mitigate her damages. In short, by choosing to pursue a career as a CNA, which, by its nature, John Morrell asserts is a lower paying field than production work, John Morrell contends that Baker forfeited her right to recover front pay.[7] It is undisputed that Baker did not attempt to find work in the production field. She testified at the postverdict hearing that, once she was constructively discharged from John Morrell, she decided that she wanted to pursue what she considers to be more fulfilling work as a CNA. Baker's physician cleared her for work in February of 2002, and on February 14, 2002, she began work at Oak Park Care Center in Sheldon, Iowa. Baker voluntarily left her employment at Oak Park Care Center in December of 2002 to care for her brother, but she was not able to find full-time employment in Sioux City, Iowa. She applied for CNA positions at several care facilities when she moved to Sioux City. In February of 2003, she accepted the highest paying dayshift CNA position she found and appears confident that the position will develop into a full-time position.

John Morrell argues that, even if Baker is entitled to front pay despite the fact she did not seek work in the production field, she is not entitled to recover front pay from December of 2002 until April of 2003—the period during which she was unemployed—because her decision to leave Oak Park Care Center was voluntary and made for personal reasons.

To meet its burden of showing that Baker failed to mitigate her damages in this case, John Morrell must establish that "other substantially equivalent positions were available to [Baker] and [s]he failed to use reasonable diligence in attempting to secure such a position."[8] *Anastasio v. Schering Corp.*, 838 F.2d 701, 708 (3d Cir. 1988) (citing *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir.1986); *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 624–25 (6th Cir. 1983); *Wehr v. Burroughs Corp.*, 619 F.2d 276, 278 n. 3 (3d Cir.1980); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir.1978)); *see Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 864 (3d Cir.1995) ("To meet its burden, an employer must demonstrate that 1) substantially equivalent work was available, and 2) the Title VII claimant did not exercise reasonable diligence to obtain the employment.") (*Anastasio*, 838 F.2d at 708); *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir.1983) ("The defendant has to show that the plaintiff failed to use reasonable care

7. In fact, John Morrell's *only* argument in opposition to Baker's claim for an award of front pay, aside from the arguments raised in its motion for judgment as a matter of law, is that she did not mitigate her damages.

8. The Court of Appeals for the Third Circuit has noted that there appears to be an exception to these general requirements in that an employer can also meet its burden on a mitigation defense where it demonstrates that the employee has withdrawn from the job market. *See Tubari Ltd. Inc. v. N.L.R.B.*, 959 F.2d 451, 454 (3d Cir.1992). This exception, however, has no application to Baker's case.

and diligence and that there were jobs available which the plaintiff could have discovered and for which the plaintiff was qualified.") (citing *Hegler v. Board of Educ.*, 447 F.2d 1078, 1081 (8th Cir.1971)).

With respect to its argument that Baker failed to mitigate her damages by becoming a CNA, John Morrell has failed to carry its burden. First, the plaintiff has a duty to use reasonable diligence in finding suitable employment, not identical employment. *See Newhouse*, 110 F.3d at 641. The court is loathe to hold that a claimant must choose between pursuing a new career or facing denial of prospective equitable relief, especially in a case such as this where the plaintiff's decision to change careers was a direct result of the discrimination she endured. Moreover, as a matter of fact, John Morrell has failed to show that an award of front pay would be equivalent to subsidizing Baker's new career because the evidence John Morrell presented at the post-verdict hearing shows that the plaintiff's new field pays approximately the same as starting wages in her former field.

Second, John Morrell did not present any evidence at the evidentiary hearing that comparable employment was actually available when Baker accepted her position at Oak Park Care Center in February of 2002 or when she moved back to Sioux City in December of 2002. Instead, Iowa Workforce Development compiled a list of "random samples" to show the type of job orders it gets for production and CNA positions. [Tr. at 21]. Thus, to the extent John Morrell contends that Baker's decision in February of 2002 to accept employment at Oak Park Care Center was not a reasonable attempt to mitigate her losses, John Morrell has failed to present any evidence that other employment was available to her or that Baker did not make an "honest, good faith effort" to minimize her damages by obtaining full-time employment. *See Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir.1988).

The evidence showed that, after Baker's constructive discharge, she immediately obtained employment as soon as her doctors cleared her to return to work. While she chose to enter a new career field, the evidence also showed that her wage as a CNA was approximately equivalent to the average starting wages in production positions. Thus, the court finds that it is reasonable and equitable to utilize Baker's wages as a CNA in calculating an appropriate front pay award.

 Still, the court recognizes that a Title VII claimant seeking front pay damages not only has a duty to mitigate those damages by exercising reasonable diligence to locate other suitable employment, but also by maintaining a suitable job once it is located. *See Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir.1999) (citing *Equal Employment Opportunity Commission v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir.1992)). The defendant argues that Baker is not entitled to front pay because she voluntarily left Oak Park Care Center. The court does not agree. A failure to mitigate does not completely foreclose a front pay award. *E.g., Reiner v. Family Ford, Inc.*, 146 F.Supp.2d 1279, 1287 (M.D.Fla.2001). It does, however, affect the amount the plaintiff can recover. *Id.* (citing *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir.1988)). Pertinent to this case, a Title VII plaintiff fails to mitigate damages by voluntarily quitting comparable interim employment for personal reasons. *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir.1992); *accord United States v. City of Chicago*, 853 F.2d 572, 579 (7th Cir.1988); *Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 547 F.2d 598, 602–03 (D.C.Cir.1976). Damages

must be "decreased by the amount [s]he would have earned had [s]he not quit." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir.1985); *cf. Greenway v. Buffalo Hilton Hotel*, 951 F.Supp. 1039, 1064 (W.D.N.Y.1997) ("Similar to the standard for determining the appropriateness of an award of backpay, a plaintiff has a duty to exercise reasonable diligence in seeking alternative similar employment or risk having the amount of front pay damages reduced by the amount that could have been earned.") (citation omitted), *aff'd*, 143 F.3d 47 (2d Cir.1998).

■ Here, Baker left Oak Park Care Center for a strictly personal, albeit admirable and selfless, reason—to care for her ailing brother. While the court is sympathetic and admires Baker's dedication to her family, the defendant should not be penalized for her choice to leave Oak Park Care Center before securing alternative employment in Sioux City.

For that reason, the court finds that Baker failed to adequately mitigate her damages. However, her failure to mitigate damages does not preclude her from recovering a front pay award entirely, especially since she minimized the effect of her failure to mitigate by promptly and diligently seeking alternative employment. The court will consider, in Section I.B.3, *infra*, of this Order, what Baker could have earned had she remained at Oak Park Care Center until such time that she secured alternative employment and will deduct this sum from what she could have earned at John Morrell but for being constructively discharged.

■ Moreover, the court finds that Baker did not fail to mitigate when she accepted employment at Countryside Senior Living, even though her position is currently part-time. Again, John Morrell did not show that, between December of 2002 and April of 2003, other CNA or factory positions were available. In addi-tion, of the random sample of CNA positions that John Morrell offered at the evidentiary hearing, Baker's current position is at the top end of salaries. Only one CNA position paid more, and Baker had inquired about that position before accepting her position at Countryside Senior Living, but she concluded that the other position was not suitable. There is a strong likelihood, based on Baker's testimony, that she will be working full-time within a year. Thus, in light of the strong likelihood that she will be working full-time within a relatively short period of time and in light of the fact her Countryside Senior Living position is one of the higher paying CNA positions, it was not unreasonable for her to accept a part-time position.

### Factor (11)—the amount of any punitive damage award

Although the factors set forth above have been utilized to determine front pay awards in the context of both Title VII cases and ADEA cases, one factor has remained controversial in its application to both acts. This factor is the consideration of any liquidated damages (under the ADEA) or punitive damages (under Title VII) that have been awarded to the plaintiff. The ADEA, unlike Title VII, provides for the recovery of "liquidated" damages. 29 U.S.C. § 626(b). The United States Court of Appeals for the Eighth Circuit has defined "liquidated damages" under the ADEA as an award "equal to the actual damages awarded." *Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 454 n. 3 (citing 29 U.S.C. § 626(b)). Section 626(b) "doubles the compensatory award [in situations where the violation of the ADEA is found to be willful] and is essentially punitive in nature." *Rademaker v. Nebraska*, 906 F.2d 1309, 1313 (8th Cir.1990) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). At least three circuit courts of appeals—the First, Fifth, and the

Seventh—have explicitly required the trial court to consider the amount of any liquidated damage award made to a plaintiff to determine whether an additional award of front pay would be inappropriate or excessive.[9] *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir.1992) (ADEA case); *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir.1990) (ADEA case); *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir.1985) (ADEA case).

Title VII, of course, does not contain a liquidated damages provision. It does, however, provide for the recovery of punitive damages. 42 U.S.C. § 1981a. Reasoning that the impact of punitive damages in a Title VII case could—like the impact of an award of liquidated damages in an ADEA case—indicate that an additional award of front pay is inappropriate or excessive, the United States Court of Appeals for the Fifth Circuit has adopted this factor in the context of Title VII. *Hadley v. VAM P T S*, 44 F.3d 372, 376 (5th Cir.1995). It is far from clear whether other courts will adopt the reasoning set forth in *Hadley*. However, it appears that the United States Court of Appeals for the Eighth Circuit would be unlikely to put much, if any, emphasis on this factor in a Title VII case. *See Newhouse*, 110 F.3d at 643 (declining to require district court to consider this factor and observing in an ADEA case that "liquidated damages are punitive in nature under the ADEA … [whereas] [f]ront pay … is equitable relief … and the resulting award of liquidated damages simply does not affect the …

court's determination of appropriate equitable relief."); *cf. Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 41 (1st Cir. 1998) (observing that it would be inappropriate in Title VII case to consider the amount of punitive damages awarded rather than the statutorily capped damage award in denying front pay because the former would not be an accurate reflection of what the plaintiff would receive).

In this case, the jury awarded Baker punitive damages in the sum of $650,000.00. Based on the court's March 17, 2003 Order, the court remitted the entirety of Baker's punitive damages award, allocating the recoverable award to Baker's emotional distress damages.[10] Even so, assuming Baker were to recover the limit of the statutory cap, 42 U.S.C. § 1981a(b)(3)(D), in punitive damages, Baker would still be precluded from recovering over one-half of the punitive damages award that the jury found was warranted.

■ The court considers the amount of punitive damages awarded in this case to be an improper factor in fashioning the equitable relief of front pay. Although at least one court has justified the applicability of this factor by analogizing liquidated damages under the ADEA to punitive damages under Title VII, *see Hadley*, 44 F.3d at 376, this court believes the sounder course is to focus on the "make-whole" purposes of prospective equitable relief. Punitive damages, by their nature, are intended to punish the defendant for its discriminatory conduct and to deter the

---

9. Since *Hearst*, the United States Court of Appeals for the Seventh Circuit has indicated disfavor with placing too much emphasis on the presence or absence of a liquidated damage award. *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 326 (7th Cir.1992).

10. In an Order dated March 17, 2003, the court remitted the plaintiff's $1.52 million jury award to $300,000.00 in compliance with

the statutory cap but found that her emotional distress damages alone supported the award. Accordingly, the court allocated the entirety of the jury award to Baker's emotional distress damages. Baker, therefore, did not recover any punitive damages. However, for purposes of the court's consideration of this factor, the court will proceed on the fiction that Baker recovered the statutory maximum amount of punitive damages, or $300,000.00.

defendant from engaging in like conduct in the future. On the other hand, the purpose of front pay is to make the plaintiff whole. *See Cowan,* 140 F.3d at 1160; *Standley,* 5 F.3d at 322. Obviously, these remedies are designed to achieve very different goals. In this court's view, the amount of punitive damages awarded is simply a neutral consideration in the front pay analysis. *Cf. Newhouse,* 110 F.3d at 643 (declaring in ADEA case that the amount of liquidated damages awarded "does not affect the ... court's determination of appropriate equitable relief."). Moreover, even if punitive damages were a relevant factor, the court concludes they would not counsel against an award of front pay because (1) Baker did not recover any of the punitive damages awarded to her, and (2) assuming she were entitled to recover punitive damages, the statutory maximum, $300,000, still represents less than one-half of the amount that the jury awarded her.

Having reviewed the evidence presented both at trial and during the post-verdict evidentiary hearing, the court is left with the firm conviction that reinstatement is not an appropriate remedy in this case. Moreover, after applying factors considered by other courts in determining the propriety of front pay awards, as well as other factors pertinent to the circumstances of this case, the court is persuaded that a front pay award is warranted here. Having made this determination, the court will turn to its calculation of the proper amount and duration of Baker's front pay award.

### 3. Calculation of the front pay award

 The first step in calculating Baker's front pay award is to determine its proper duration. The court recognizes that a front pay award will contain some degree of speculation. However, the award should not be "unduly speculative." *Barbour,* 48 F.3d at 1280; *McKnight,* 973

F.2d at 1372. Baker has requested twenty years of front pay compensation but has offered only her testimony to justify such a lengthy award. Mindful that "[t]he longer a proposed front pay period, the more speculative the damages become," *McKnight,* 973 F.2d at 1372, the court is convinced that Baker's testimony does not provide an adequate basis to support the length of front pay requested. *See Partington v. Broyhill Furniture Industries, Inc.,* 999 F.2d 269, 273 (7th Cir.1993) (observing that as a general proposition, "[t]he amount of proof required to establish damages will tend ... to be proportional to the amount of damages claimed."). In fact, the court is confident that a twenty-year award of front pay is unsupportable as a matter of law. *See United Paperworkers Internat'l Union,* 81 F.3d at 805 (rejecting award of twenty-four years of front pay and stating "An award of front pay until retirement ignores the plaintiff's duty to mitigate damages and the district court's corresponding obligation to estimate the financial impact of future mitigation. Instead of warranting a lifetime of front pay, [the plaintiff's] relatively young age should improve his future opportunities to mitigate through other employment.") (internal citation omitted) (citing *Hybert v. Hearst Corp.,* 900 F.2d 1050, 1056–57 (7th Cir.1990) (five years was too speculative); *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 890 (3d Cir.1984) (affirming four months of front pay because a longer period would be speculative); *Snow v. Pillsbury Co.,* 650 F.Supp. 299, 300 (D.Minn.1986) (nine-year award reduced to three years)).

At the post-verdict hearing, Baker explained that she based her request for twenty years of front pay, in part, on her estimation of the length of time she would have remained employed by John Morrell. In addition, she testified that, based on her knowledge of the wage increases available to CNAs, she would never obtain the level

of income she enjoyed at John Morrell. The court agrees that Baker would have remained in her position at John Morrell until she reached retirement absent the discrimination. However, the court is unwilling to adopt the twenty-year figure as a proper approximation for the front pay award because the court finds that it is more likely than not that Baker will earn a top CNA income in substantially less time.

While the court was not sympathetic to John Morrell's argument that Baker failed to mitigate her damages by becoming a CNA because of the similar starting wages for production workers and CNAs, the court is mindful that production workers tend to receive greater wage increases and at shorter intervals than do CNAs. Both John Morrell's witness from Iowa Workforce Development and Baker testified to this effect at the post-verdict hearing. The court will take this into consideration in determining the duration of Baker's front pay award.

After considering the evidence presented, the court finds that a twenty-year front pay award would be unduly speculative and otherwise excessive. The court concludes that a three-year front pay award would be more appropriate under the circumstances of this case. Three years affords Baker a reasonable amount of time to sufficiently recover from her post-traumatic stress and anxiety disorders such that she can participate fully in the job market. Additionally, an award of three years of front pay is appropriate because it will strike the proper balance between the need to make Baker "whole" without unduly penalizing the defendant for Baker's career move and the need to avoid unduly speculative front pay awards.

The next step is to calculate Baker's estimated yearly income from John Morrell for these three years less her mitigation damages.[11] Until January 6, 2003 (that is to say, during the first 14 weeks of the front pay award period), Baker would have earned $11.15 per hour at John Morrell. On January 6, 2003, she would have received a fifty cent pay raise. The parties agree that, were Baker still employed by John Morrell as a computer scale operator, she would currently be earning $11.45/hour. John Morrell also did not present any evidence to dispute Baker's claim that she worked, on average, 40 hours per week of regular time and 3.75 hours per week of overtime. Based on testimony presented at trial and at the post-verdict hearing, the court finds that Baker's assertion regarding the amount of overtime she worked is accurate. Because Baker earned time and one-half for hours in excess of 40 hours, Baker would have earned $16.73/hour through January 5, 2003 and $17.18/hour thereafter for overtime work. Thus, assuming Baker worked 43.75 hours per week, she would have earned $7,122.06 during the first 14 weeks of this three-year (or 156 week) period, which began September 28, 2002 and ended January 5, 2003. She would have earned $74,181.69 during the remaining 142 weeks. In sum, Baker would have earned $81,303.75 during the duration of the front pay award if she were still employed by John Morrell.[12]

Because the court finds that Baker failed to mitigate her damages when she

---

**11.** Based on the fact Baker sought, and was awarded, backpay through September 27, 2002, (Pf.'s Trial Exh. 20), the court finds that the three year front pay period began on September 28, 2002 and will end on September 27, 2005.

**12.** The court arrived at the figure for the first 14 week period as follows: (11.15 dol-

lars/hour × 40 hours/week) + ((11.15 dollars/hour × 1.5) × 3.75 hours/week) × 14 weeks = $7,122.06. To calculate what Baker would have earned at John Morrell during the remaining 142 weeks of the front pay award period, the court utilized the following equation: (11.45 dollars/hour × 40 hours) + ((11.45 dollars/hour × 1.5) × 3.75 hours/

left her full-time job at Oak Park Care Center and because John Morrell failed to show that any other comparable employment was available to Baker when she reentered the workforce after being constructively discharged from John Morrell, the court will deduct what Baker earned and what she could have earned at Oak Park Care Center from the beginning of the front pay award period until she began employment at Countryside Senior Living. Because Baker received benefits when she was employed at Oak Park Care Center, she is not entitled to recover their monetary value during this period from September of 2002 until April of 2003. Thus, for the first 26 weeks of the front pay award period (September 28, 2002–April 28,2003), Baker could have earned $8,850.40 at Oak Park Care Center.

Once beginning work for Countryside Senior Living, the court finds that, based on Baker's testimony at the post-verdict hearing, she will be working full-time beginning in April of 2004. Prior to that time, Baker estimates the following working schedule:

- April 2003 (4 weeks), 12 days/month
- May 2003–September 2003 (22 weeks), 8 days/month
- October 2003–March 2004 (26 weeks), 12 days/month

Therefore, during the first 4 weeks of the front pay award period, Baker will earn $864.00. During the next 22 weeks, Baker will earn $2,880.00. During the next 26 weeks, Baker will earn $5,184.00. After that time, during the remaining 78 weeks of the front pay award period, Bak-

er earnestly believes she will be working 40 hours/week, earning a sum total of $28,080.00. The sum total of these periods at Countryside Senior Living is $37,008.00. When combined with what she could have earned at Oak Park Care Center during the first 6 months, or 26 weeks ($8,850.40), of the front pay award period, Baker could have earned a total of $45,858.40.

The difference in wages between what Baker could have earned at John Morrell and what she could have earned and will earn as a CNA is $35,445.35. Because both her John Morrell and her Oak Park Care Center positions provided benefits, the court finds that, absent Baker's voluntary decision to leave Oak Park Care Center, she would have been receiving benefits during the first nine months of the front pay award period. Baker also testified that she will be full-time and, consequently, eligible for benefits at Countryside Senior Living after one year of employment. The court, therefore, will include the monetary value of the benefits Baker would have received at John Morrell in the front pay calculation for only a 12–month period—that is, for the period of time Baker is ineligible for benefits at Countryside Senior Living. Baker's and John Morrell's estimations of the monetary value of benefits are strikingly similar. However, because John Morrell is in the best position to accurately report this figure, the court will utilize John Morrell's $3,476.00/year figure. Thus, the court will add this figure to the difference between what Baker could have earned at John Morrell and what she reasonably could have earned as a CNA over a three-year period, arriving at a total front pay award of $38,921.35.[13]

week) × 142 weeks = $74,181.69. To arrive at the sum total, the court simply added these two figures: $7,122.06 + $74,181.69 = $81,303.75.

13. The court calculated what Baker could have earned at Oak Park Care Center if she had remained there through March of 2003,

or 26 weeks: (8.51 dollars/hour × 40 hours) × 26 weeks = $8,850.40. Then, working eight-hour days at Countryside Senior Living, the court multiplied $9.00/hour by 12 days, arriving at $864.00, to determine what she will earn the first month at Countryside Senior Living. Then, for the next 5 months, the

The final step in the front pay calculation is to reduce the award to present value. The parties have offered no evidence on this issue or otherwise suggested an appropriate discount method. Courts have taken a variety of approaches to the adjustment issue. For example, some courts have required application of "discount tables" to assess the present value of front pay awards. *See, e.g., Suggs v. ServiceMaster Educ. Food Management,* 72 F.3d 1228, 1235 (6th Cir.1996) (reiterating the need to use the "discount tables" to reduce the amount of the award to present value). Other courts have simply instructed that a proper discount rate be used. *See, e.g., Barbour,* 48 F.3d at 1280 (stating "[a]ll that remained was for [the district court] to determine the appropriate duration of a front-pay award, ... to incorporate any proper salary increases, and then to determine the award's present value using an appropriate discount rate."); *Rhodes v. Guiberson Oil Tools,* 82 F.3d 615, 622 (5th Cir.1996) (reaffirming the Fifth Circuit's requirement that "factfinders calculate damages resulting from lost future earnings according to a below-market-discount method."). Another method that has been endorsed by courts is what is known as the "total-offset method." Under this method, no discount to present value is required on the theory that "any interest rate which might otherwise drive a discount would be totally offset by such

things as price inflation and real wage increases...." *Newhouse v. McCormick & Co.,* 910 F.Supp. 1451, 1457 (D.Neb.1996), *aff'd in part and rev'd in part,* 110 F.3d 635 (8th Cir.1997); *see also Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 544–46, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) (discussing the "total offset" approach). A variation of the total-offset approach, approved by the United States Court of Appeals for the Second Circuit, is to refrain from calculating future salary increases into the front pay award, thereby obviating the need to discount the award to present value. *Stratton v. Department for the Aging for City of New York,* 132 F.3d 869, 882 (2d Cir.1997).

Here, the court finds that given the relatively short duration of the front pay award, any interest that would be earned on the sum will be offset by inflation and future wage increases. Future wage increases have not been accounted for in the calculation. Therefore, the final sum of Baker's front pay award is $38,921.35.

### C. Plaintiff's Request for Attorney's Fees

The plaintiff seeks an award of attorney's fees in the amount of $164,841.23. In addition, the plaintiff seeks $11,807.23 for expenses incurred during the course of litigation as part of her fee request. These figures are current through May 14, 2003 [14] and represent a combined total for

court calculated Baker's earnings as follows: (($9.00/hour × 8 hours) × 8 days/month) × 5 months = $2,880.00. Similarly, the court calculated Baker's earnings for the next 6 months as follows: (($9.00/hour × 8 hours) × 12 days/month) × 6 months = $5,184.00. For the remaining 78 week period, the court performed the following calculation: (($9.00/hour × 8 hours/day) × 5 days/week) × 78 weeks = $28,080.00.

Adding all these earnings and potential earnings, the total of what Baker earned and could earn in the front pay award period is: $8,850.40 + $864.00 + $2,880.00 +

$5,184.00 + $28,080.00 = $45,858.40. The difference between this figure and what she could have earned at John Morrell was calculated as follows: $81,303.75—$45,858.40 = $35,445.35.

14. The hours claimed by plaintiff's counsel are the sum of the hours contained in plaintiff's (1) fee application (Doc. No. 122), (2) two written supplements (Doc Nos. 167, 206), and (3) the oral supplement provided at the May 14, 2003 hearing on the plaintiff's Motion to Reconsider.

the work of attorneys Stan Munger, Jay Denne, and Colby Lessman; paralegals Ann Collins, Brenda DeLance, and Patricia Marvin [15]; and Baker's former attorney, Teresa O'Brien.

### 1. Applicable standards

The number of hours claimed, and the hourly rates billed by plaintiff's attorneys and their paralegals are as follows:

### FEES CLAIMED FOR ATTORNEYS

| Name | Hrs. | Rate | Total Fee Claimed |
| --- | --- | --- | --- |
| Mr. Munger | 348.1 | $275 | $ 95,727.50 |
| Mr. Denne | 229.05 | $175 | $ 40,083.75 |
| Mr. Lessman | 28.55 | $125 | $ 3,568.75 |
| Ms. O'Brien | | | $ 609.23 |
| **Total Hrs. Claimed** | 581.7 | **Total Fee Requested** | $139,989.23 |

### FEES CLAIMED FOR PARALEGALS

| Name | Hrs. | Rate | Total Fee Claimed |
| --- | --- | --- | --- |
| Ms. Collins | 325.6 | $75 | $24,420.00 |
| Ms. DeLance | 3.45 | $60 | $ 207.00 |
| Ms. Marvin | 3.75 | $60 | $ 225.00 |
| **Total Hrs. Claimed** | 332.8 | **Total Fee Requested** | $24,852.00 |

■ The court has discussed the standards by which fees are awarded in its prior decisions, including, for example, *Rural Water Sys. No. 1 v. City of Sioux Ctr., Iowa,* 38 F.Supp.2d 1057, 1062–63 (N.D.Iowa 1999), *aff'd,* 202 F.3d 1035 (8th Cir.2000), *Schultz v. Amick,* 955 F.Supp. 1087 (N.D.Iowa 1997), and *Houghton v. Sipco, Inc.,* 828 F.Supp. 631 (S.D.Iowa 1993), *vacated on other grounds,* 38 F.3d 953 (8th Cir.1994). Thus, the court will not engage in another detailed recitation of applicable standards. Instead, it suffices to say that "a prevailing plaintiff ' "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." ' " *See Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (interpreting *Civil Rights Attorney's Fees Awards Act of 1976,* 42 U.S.C. § 1988, which allows a "prevailing party" to recover from his or her adversary "a reasonable attorney's fee as part of the costs") (internal quotation marks omitted) (quoting S.Rep. No. 94–1011, p. 4 (1976), in turn quoting *Newman v. Piggie Park Enter., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)); *accord Schultz,* 955 F.Supp. at 1109.

■ Fees are usually calculated according to the "lodestar" method, which multiplies hours reasonably expended by a reasonable hourly rate. *Schultz,* 955 F.Supp. at 1110; *accord Warren v. Prejean,* 301 F.3d 893, 904 (8th Cir.2002) (" 'The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours expended by the reasonable hourly rates.' ") (quoting *Fish v. St. Cloud State Univ.,* 295 F.3d 849, 851 (8th Cir.2002)). Still, under *Hensley,* "the most critical factor is the degree of success obtained." *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933; *see also Emery v. Hunt,* 272 F.3d 1042, 1047 (8th

**15.** Ms. Marvin is not a paralegal, but the plaintiff seeks fees for her work only insofar as she was performing paralegal services.

Cir.2001) (characterizing *Hensley* standard as "result-oriented") (quoting *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933; citing *Jenkins v. Missouri*, 127 F.3d 709, 718 (8th Cir. 1997) (en banc)). The process of arriving at reasonableness includes "the plaintiff's overall success; the necessity and usefulness of the plaintiff's activity in the particular matter for which fees are requested; and the efficiency with which the plaintiff's attorneys conducted that activity." *Jenkins*, 127 F.3d at 718. Reductions may be made, however, for such things as partial success, duplicative hours or hours not reasonably expended, *Schultz*, 955 F.Supp. at 1111–12, 1114–16, or for "block billing" or poor record-keeping. *See Houghton*, 828 F.Supp. at 643–44.

In this case, John Morrell asserts that reductions should be made on each of these grounds to the requested fees and expenses. With respect to the plaintiff's fee application, the defendant argues that it should be reduced because (1) the hourly rates of the plaintiff's attorneys are excessive, (2) plaintiff's counsels' documentation of hours expended is inadequate, (3) time spent on the case is excessive, (4) plaintiff should not be able to recover for Ms. Collins's attendance at depositions, pretrial conferences, and trial, and (5) the plaintiff did not prevail at trial on her disparate treatment claim.

### 2. Reasonable hourly rate

■ "As a general rule, a reasonable hourly rate is the prevailing market rate, that is, 'the ordinary rate for similar work in the community where the case has been litigated.'" *Moysis v. DTG Datanet*, 278 F.3d 819, 828–29 (8th Cir.2002) (quoting *Emery v. Hunt*, 272 F.3d 1042, 1047 (8th Cir.2001)). Procedurally, the Supreme Court has explained that,

To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attor-

ney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

*Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

■ Thus, the party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable. *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir.1996) (citing *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933). To meet its burden, the fee petitioner must "submit evidence supporting the hours worked and rates claimed." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. In a statutory fee case, such as this one, the party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee. *Bell v. United Princeton Props., Inc.*, 884 F.2d 713 (3d Cir.1989). The district court cannot decrease a fee award based on factors not raised at all by the adverse party. Once the adverse party raises objections to the fee request, the district court has a great deal of discretion to adjust the fee award in light of those objections. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933; *accord Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 675 (8th Cir.1995) (noting that "the plaintiff bears the burden of establishing an accurate and reliable factual basis for an award of attorneys' fees," and explaining that "the district court has wide discretion in making a fee award determination") (citing *Rogers v. Kelly*, 866 F.2d 997, 1001 (8th Cir.1989)).

■ In determining a reasonable attorney fee, the district court should con-

sider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), though the court need not exhaustively address every factor.[16] *Emery v. Hunt*, 272 F.3d 1042, 1048 (8th Cir.2001). Nevertheless, the district court should consider what factors, "in the context of the present case, deserve explicit consideration." *Griffin v. Jim Jamison, Inc.*, 188 F.3d 996, 997–98 (8th Cir.1999).

In addition, the district court may consider other factors, such as the attorney's regular hourly rates, skill or representation, difficulty of work performed, and counsel's experience and reputation. *See Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). A court should also use its own knowledge, experience and expertise in determining the fee to be awarded. *Gilbert v. City of Little Rock, Ark.*, 867 F.2d 1063, 1066–67 (8th Cir.1989).

Plaintiff's lead counsel, Mr. Munger, asserts that his hourly rate of $275 is commensurate with his experience and professional stature and is reasonable in light of the extraordinary level of success obtained in this case and in light of the market rate for comparable attorneys who practice employment discrimination cases. John Morrell cites a 2001 Iowa State Bar Association survey, which reports data from the year 2000, for the proposition that Mr. Munger should not be entitled to claim an hourly rate in excess of $200, which is Mr. Munger's customary hourly billing rate. John Morrell also submitted the affidavit of a local Sioux City, Iowa attorney who routinely represents defendants in employment discrimination cases.

The affiant asserts that he is familiar with fees charged by attorneys representing clients in civil rights cases in northwest Iowa. His customary hourly rate is $160, and he states that, in his opinion, an hourly rate of $275 is excessive. The court, however, does not place much weight on this attorney's affidavit because the comparison between he and Mr. Munger is unavailing. The court is intimately familiar with the local bar and does not believe that the affiant presents a proper comparison. While the affiant is a respected and capable *litigator*, he is not a trial lawyer, at least in this federal court. As a highly skilled and experienced trial lawyer who regularly appears in federal court, Mr. Munger is entitled to charge a premium for his services. Trial lawyers, like Mr. Munger, who routinely try complex federal jury cases, are certainly entitled to a premium fee in comparison to litigators who push lots of papers, take lots of depositions, file lots of motions, but who seldom actually try cases in federal court.

This is especially true in light of the disturbing trend of fewer and fewer civil jury trials being tried in federal courts nationwide. Thus, it seems to this court that while there appears to be no shortage of "litigators"—indeed they seem to be propagating throughout the profession—true federal civil "trial lawyers," those willing to delve into the crucible of federal civil jury trials on a regular basis, are becoming an endangered species. Moreover, there is probably no greater shell

---

16. The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

game in the law than "litigators" attempting to pass themselves off as real "trial lawyers." Stories of "litigation partners" at mid- and large-size firms with virtually no or extremely limited real federal civil jury trial experience are legion. In sum, while there are many terrific litigators, there are far fewer terrific federal trial lawyers who ply their craft on a regular basis before federal civil juries. Most assuredly, Mr. Munger is in this very select and prestigious inner circle and, as such, deserves to be compensated accordingly.

Mr. Munger, moreover, asserts, and the court agrees, that the relevant market is not confined to Sioux City, Iowa nor northwest Iowa not least because attorneys from the surrounding metropolitan areas regularly appear in Iowa courts in employment discrimination cases. He urges the court to compare his hourly rate to the market rate of comparable civil rights attorneys in Des Moines, Iowa, Omaha, Nebraska, Sioux Falls, South Dakota, Kansas City, Missouri, and Minneapolis, Minnesota.

The court also does not agree with John Morrell's contention that any rate higher than Mr. Munger's customary billing rate is unreasonable. While Mr. Munger's customary rate, as well as that of Mr. Denne, for that matter, is one factor, it is not the only factor. *Cf. Jaquette v. Black Hawk Cty., Iowa*, 710 F.2d 455, 458–59 (8th Cir. 1983) (" 'This court does not accept the attorneys' usual billing rate as definitively fixing their billing rates for this litigation.' ") (citations omitted). In an analogous context, the Supreme Court held that a civil rights attorney's customary 40% contingency fee did not place a ceiling on the amount of fees he could recover under the fee-shifting statute. *Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). The plaintiff's attorneys in this case are similarly not strapped by their customary hourly rate, especially when they do not charge hourly rates for civil rights cases.

In 2000, Mr. Munger entered into a contingency fee agreement with 57% of his clients in civil rights cases. In 2001, the percentage increased to 82%, and, in 2002, 70% of his civil rights clients were represented pursuant to contingency fee arrangements. Throughout this time period, Mr. Munger's contingency fee was 35%. Thus, had Mr. Munger been paid on contingency basis, he would be entitled to $532,974.74—an amount over three times the total fee request in this case—based on the jury's $1.52 million verdict in Baker's favor. In fact, it is noteworthy that Mr. Munger indeed took Baker's case on a contingency fee basis, even though he is now entitled to attorney's fees pursuant to 42 U.S.C. § 1988. The Supreme Court held that "the presence of a pre-existing fee agreement may aid in determining reasonableness." *Blanchard*, 489 U.S. at 93, 109 S.Ct. 939. Here, the agreement between the plaintiff and her lawyers strongly supports the reasonableness of Mr. Munger's, Mr. Denne's, and Mr. Lessman's rates, especially when viewed in light of the extraordinary reasonableness of the entire fee request compared to what the plaintiff's lawyers would have been entitled to under the pre-existing contingency agreement. *See id.*

Mr. Munger compares his skill and experience to a prominent Des Moines, Iowa attorney, Roxanne Conlin, who was recently awarded $300 per hour in a civil rights case brought in the Iowa District Court for Polk County. The plaintiff also filed an affidavit of Ms. Conlin in which she attests to her familiarity with Mr. Munger's work and reputation and to her belief that Mr. Munger's claimed hourly rate is reasonable. Furthermore, she states that her customary hourly fee is $350, and she cites recent cases in which courts have awarded

her clients fees that range from $300/hour to $350/hour. And finally, Mr. Munger notes that, three years ago, this court determined that his claimed hourly rate of $250 was not unreasonable in *Prine v. Sioux City Community School District,* Case No. C98–4029–MWB (N.D.Iowa Apr.17, 2000).

▪ Again citing the 2001 Iowa State Bar Association survey, John Morrell argues that Mr. Denne's claimed $175 hourly rate is excessive because it exceeds the median rate for attorneys at a similarly-sized law firm with similar experience, based on the 2001 survey. Instead, John Morrell believes that $150/hour is reasonable.[17] Similarly citing the survey, the defendant asserts that Mr. Lessman is not entitled to claim more than $120/hour.

▪ Attorney's fee awards in civil rights cases are designed "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." *City of Riverside v. Rivera,* 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (referencing fee awards under 42 U.S.C. § 1988 and quoting *Kerr v. Quinn,* 692 F.2d 875, 877 (2d Cir.1982)). In specialized areas of law, such as civil rights, the national market may provide a reasonable hourly rate. *See Casey v. City of Cabool, Mo.,* 12 F.3d 799, 805 (8th Cir. 1993) (" 'A national market or a market for a particular legal specialization may provide the appropriate market.' ") (citation omitted). This is so because,

> Fee awards must be structured so that attorneys of quality and experience with other profitable demands upon their time will not need to sacrifice in-

come available in alternative enterprises in order to effect a public policy intended to protect all citizens. In other words, "the market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff." *Gusman v. Unisys Corp.,* 986 F.2d 1146, 1149 (7th Cir.1993) (quoting *Barrow v. Falck,* 977 F.2d 1100, 1105 (7th Cir.1992)). Any other rule would relegate civil rights enforcement (and the law that results) to those lawyers with below-market billing rates. The rates for these lawyers are usually below market for a reason. A refusal to pay for the experience and expertise will exact a cost in the form of inexperience and, perhaps, incompetence.

*Casey,* 12 F.3d at 805.

The plaintiff initially offered very little for the court to determine whether the claimed rates were reasonable. Most fee applications include, at minimum, affidavits of comparable attorneys who attest to their rates and the reasonableness of the rates claimed. In the court's experience, the plaintiff's attorneys' claimed rates were not unreasonable, but, in an Order dated March 13, 2003 (Doc. No. 172), the court requested that the plaintiff supplement the paltry record on the issue of reasonableness in order to allow the court a more meaningful opportunity to review the fees. The plaintiff accepted the court's invitation to supplement her record and filed the previously mentioned affidavit of Ms. Conlin, as well as the entirety of the 2001 Iowa lawyers' income survey, a portion of which the defendant filed in support of its resistance.

---

17. In its original resistance to the plaintiff's fee request, John Morrell argued that Mr. Denne is not entitled to charge an hourly fee in excess of $150. However, in its Supplemental Brief in Resistance to Plaintiff's Fee Application (Doc. No. 202), filed after the post-verdict hearing, John Morrell argued that Mr. Denne is foreclosed from charging fees in excess of $125/hour.

For its part, as mentioned, John Morrell offered *portions* of the 2001 Iowa State Bar Association survey, titled *The Economics of Law Practice in Iowa in 2001,* to challenge the claimed rates, but the court rejects the notion that plaintiff's attorneys' claimed rates are excessive based on this survey alone because it is sorely dated, it fails to account for trial experience, especially federal court trial experience, expertise specifically in complex employment law cases, skill, and reputation. Moreover, nothing in the portion of the survey filed by John Morrell indicates the source of the data used to compile the figures nor the percentage of Iowa attorneys who responded to the Iowa State Bar Association's survey. In short, John Morrell did not provide the court with any information tending to show the accuracy or reliability of the survey.

The plaintiff, on the other hand, submitted the entire 2001 survey in anticipation of the post-verdict evidentiary hearing held on her motions for attorneys' fees and to amend judgment. The portions of the survey omitted by the defendant discussed the methods and measures the Iowa State Bar Association used to compile the data, as well as fees broken down by field of law. The survey represents responses from only 20.9% of in-state Iowa State Bar Association members. [Survey, at 2]. Therefore, the salaries offered by the defendant represent the median salaries of only 20.9% of Iowa attorneys in the year 2000. The survey itself cautions readers to "use particular caution in interpreting data when only a small number of responses are available." [Survey, at 4]. With respect to the Sioux City area, or Judicial District 3B, which the defendant argues is the relevant "community" for assessing the reasonableness of the plaintiff's attorneys' hourly rates, only 6.6% of attorneys who received the questionnaire on which the survey was based responded. By definition, then, the data are suspect because of the limited number of responses that the figures are based on.

Even if the court were to accept the validity of the survey as being representative of hourly rates in the relevant community, in the court's view, the survey does not establish that the rates claimed by the plaintiff are unreasonable. Conversely, much of the data support a finding that the rates are reasonable. With respect to Mr. Munger's claimed hourly rate of $275, the survey shows that civil rights attorneys command a higher hourly rate than the average rate for other fields of law. [Survey, at 25].

Indeed, the 95th percentile of 2001 hourly billing rates in the field of civil rights is nearly double that of the average 95th percentile of 2001 hourly billing rates for all legal fields. In civil rights, the 95th percentile of reporting attorneys charged $350/hour, while the average 95th percentile hourly rate for all fields of law was only $180. No other field of law showed such a large disparity. The next highest 95th percentile hourly rate was $300 in the field of intellectual property. Given Mr. Munger's skill, reputation, and experience in civil rights cases, coupled with the court's familiarity with Iowa civil rights attorneys in general, the court is confident that Mr. Munger fits within the top percentile of Iowa civil rights attorneys and, thus, that his claimed hourly rate of $275 is not excessive when compared to the top civil rights attorneys in the state.

The data also support a finding that Mr. Denne's $175 claimed hourly rate and Mr. Lessman's $125 claimed hourly rate are reasonable. Mr. Denne's rate falls into the 75th percentile of civil rights attorneys' hourly billing rates, and Mr. Lessman's rate is below the 25th percentile of such hourly rates. [Survey, at 25]. Surely, given Mr. Denne's experience and success in employment discrimination cases, he is

entitled to fees in excess of the median rate, especially in light of the fact that the survey is dated and, thus, the rates reported in the survey are likely lower than they would be if reported today. Most attorneys surveyed (78%) reported that they had raised their hourly rates within the last two years of the date of the survey. In light of this fact, it is reasonable to conclude that the median hourly rates reported in the survey are lower than they would be today, three years after the Iowa State Bar Association conducted the survey. Further, Mr. Lessman, too, is a skilled, albeit a less experienced, lawyer, and his claimed hourly rate, which falls well below the median, is very reasonable.

The court is directed to fix hourly rates according to, among other factors, its own knowledge, experience and expertise, *Gilbert*, 867 F.2d at 1066–67, and the court opines that the median hourly rate for all attorneys, as reported in the 2001 survey, is not representative of current reasonable hourly rates for work on complex employment discrimination cases, such as this one. Moreover, nor is the survey representative of rates charged by experienced and skilled trial lawyers, such as plaintiff's counsel. The survey itself notes that 48% of respondents considered "reputation, experience, and ability as a lawyer" as a "very important" factor when charging for legal services. [Deft.'s exh. 1, at 31]. This factor ranked second only to hours involved in the case. [Deft.'s exh. 1, at 31]. Clearly then, reputation, experience, and ability are important considerations to Iowa attorneys when setting their own fees, and plaintiff's counsel has among the top reputations and trial experience in employment discrimination cases in the state.

This court is familiar with the abilities of all three of plaintiff's lawyers and considers them to be able, experienced, and talented attorneys. Mr. Munger has submitted an affidavit showing that the hourly rate sought for his work is reasonable in this community. Even though this affidavit notably failed to mention his customary hourly rate, based on the affidavit and on the court's familiarity with fees in the community and surrounding areas, the court finds the hourly rate is reasonable.[18] Mr. Munger enjoys the respect of the legal community and is a zealous advocate for his clients. He has over 25 years of experience and has made substantial contributions to the field of civil rights law. Mr. Munger may lack the national reputation of his offered comparable, Ms. Conlin, but he undoubtedly has an extraordinary regional reputation that extends far beyond the Sioux City, Iowa area. Moreover, as a federal trial court judge, I have had the privilege of having both Mr. Munger and Ms. Conlin in trial before me in civil rights cases. I am, therefore, in a unique position to judge their skill and ability and am able to confidently say that, based on my experience with each of them, Mr. Munger is entitled to charge fees that are comparable to Ms. Conlin's fees, as they are among the top two civil rights trial attorneys in the state of Iowa.

In her affidavit, Ms. Conlin states that her customary hourly rate is $350 and she cited recent Title VII cases in which her clients have been awarded fees of $300 (two cases) and $350 (one case) for her services. Moreover, based on her familiarity with Mr. Munger's reputation, abilities, and experience, Ms. Conlin believes that an hourly rate of $275 is very reasonable. Although the court considers the hourly

---

18. Discovery in this case was re-opened on the issue of attorney's fees prior to the post-verdict hearing. At the hearing, John Morrell offered plaintiff's counsel's answers to interrogatories concerning their customary billing rates. Mr. Munger's customary rate is $200/hour and Mr. Denne's is $120/hour

rates claimed by Mr. Munger to be generous, it does not find them to be unreasonable, and they will be accepted for purposes of arriving at the lodestar.

Mr. Denne has also appeared before this court on numerous occasions, and the court is familiar with his reputation and ability as a thorough, conscientious, and skilled attorney. The fees claimed by Mr. Denne are not extraordinary and, in fact, are humbly in line with the data provided by the defendant in the 2001 survey. The court concludes that, in light of Mr. Denne's experience and qualifications, and the complex nature of the litigation and the hours involved, an hourly rate of $175 for Mr. Denne in this case is "consistent with market rates and practices" for similar work in the community. *See Jenkins,* 491 U.S. at 287, 109 S.Ct. 2463; *Moysis,* 278 F.3d at 828–29. And while Mr. Lessman has not appeared as lead counsel before this court, the court is confident that his modest $125 hourly rate is reasonable. The 2001 income survey supports this conclusion.

Therefore, in sum, the court finds that hourly rates of $275, $175, and $125 for the services of Mr. Munger, Mr. Denne, and Mr. Lessman, respectively, are reasonable.[19] John Morrell did not challenge the hourly rates claimed for the paralegals' services who worked on this case, and the court finds that these hourly rates are also reasonable—$75 (Ms. Collins); and $60 (Ms. DeLance and Ms. Marvin). Accordingly, the court will utilize these hourly rates in arriving at the lodestar amount in this case.

### 3. Hours reasonably expended

John Morrell's next challenge to the plaintiff's fee request targets the hours her attorneys expended on this case. First, John Morrell urges the court to reduce counsels' fee to account for inadequate documentation and for time excessively expended. Specifically, the defendant contends that Mr. Munger and Mr. Denne charged for time that is either excessive, redundant, or otherwise unnecessary. Second, John Morrell contends that plaintiff's fee request should be reduced to exclude fees charged by Mr. Munger's paralegal, Ms. Collins, for attending pretrial and court proceedings.

■ This court has repeatedly held that attorney fees may be reduced for inadequate documentation or poor record-keeping. *See, e.g., Rural Water Sys. # 1 v. City of Sioux Center, Iowa,* 38 F.Supp.2d 1057, 1063 (N.D.Iowa 1999) (citing *Houghton v. Sipco, Inc.,* 828 F.Supp. 631, 643–44 (S.D.Iowa), *vacated on other grounds,* 38 F.3d 953 (8th Cir.1994)). The Eighth Circuit Court of Appeals has recognized that it is not necessary for the district court "to examine exhaustively and explicitly, in every case, all of the factors that are relevant to the amount of a fee award," but the district court should consider what factors, "in the context of the present case, deserve explicit consideration," which may include, for example, the number of lawyers who had previously declined to represent the plaintiff before he or she found counsel to prosecute the case, whether the plaintiff obtained relief from all of the defendants sued, and the extent

---

**19.** The court recognizes that the quality of counsel's work can be considered in determining a reasonable fee. *E.g., Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982). The defendant argues that, because of plaintiff's counsel's failure to plead a parallel state-law cause of action, the court should consider this oversight in arriving at a reasonable hourly rate. The court first notes that the plaintiff has filed a motion to reconsider and, therefore, that the court's March 17, 2003 Order is not necessarily final. In addition, the court does not agree that this failure to plead state law affects the reasonableness of the rates claimed.

of the relief obtained against any particular defendant. *Griffin v. Jim Jamison, Inc.*, 188 F.3d 996, 997–98 (8th Cir.1999). In the face of arguments that the fees claimed are vaguely described, duplicative, or excessive for the work done, the court should carefully review the documentation supporting the fee request and provide reasons for determination of the amount awarded. *See Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330 (8th Cir.1995).

 In this case, the defendant urges the court to cut a significant portion of the plaintiff's fee request because of poor record-keeping and duplicative work by Mr. Munger and Mr. Denne. The court agrees that the documentation that the plaintiff's attorneys filed in support of her fee request could have been, at minimum, better. The entries are vague but are sufficiently detailed to support the request for fees. Moreover, the court also recognizes that plaintiff's attorneys possessed more detailed documentation but that, in their opinion, it revealed work product and client confidences. They offered to submit the more detailed records for the court to review *in camera*, but the court declined, relying instead on the plaintiff's assertions as to the records' accuracy and the extraordinary reasonableness of the overall fee request.

Here, the court has made a determination that the summary time entries filed by the plaintiff are adequate, and it would be, in the court's opinion, unjust to reduce her fee request for poor documentation when the court declined her invitation to review more detailed records. *Cf. Kline v. City of Kansas City, Mo., Fire Dep't*, 245 F.3d 707, 708–09 (8th Cir.2001) (stating that "contemporaneous time accounts are not required to support a motion for attorneys' fees as long as the trial court concludes that reconstructed records 'satisfactorily document [the] time'" and holding that there is "little reason to require a reduc-

tion of attorneys' fees in the same circumstances.") (citations omitted). Moreover, the court's decision to not review the more detailed documentation was not only based on the plaintiff's assurance as to the accuracy of the filed entries, but also on the overall reasonableness of the request. The documentation is not what the court would like it to be, but the overall request is so reasonable—indeed, modest—that it would be nonsensical to deduct for poor record-keeping or duplication of effort. The total fee requested is so modest that the court cannot fathom how overbilling could have resulted or how any effort could have been duplicated in light of the hours charged.

To highlight how incredibly reasonable the plaintiff's fee request is, the court points out that plaintiff's attorneys' fees total $164,841.23, whereas defendant's counsel billed their client over twice that amount despite the fact one of its lawyers was in-house. This means that in-house counsel was not paid an hourly rate for the time he spent on the case, and his time would have been substantial because he participated in the entire trial. Under the circumstances of this case, the court will not deduct for poor record-keeping or duplication of effort even though the court is fully cognizant of its discretion to do so here.

 With respect to John Morrell's argument that plaintiff should not be able to charge for time billed by both Mr. Munger and Mr. Denne for time spent consulting with one another, the court flatly rejects the defendant's assertion that counsels' billing for time spent in conference with staff is unreasonable. Indeed, defendant's counsels' invoices are replete with charges for conferring with one another. (Doc. No. 187). Moreover, the defendant has cited no authority in support of its proposition that such fees equate to "double bill-

ing." The court has reviewed plaintiff's counsels' entries for time spent in consultation with one another and finds that the amount of time spent in conference is reasonable. Indeed, plaintiff's lead counsel, Mr. Munger, has requested a mere 7.25 hours of time spent in consultation with Mr. Denne and Ms. Collins.

■ The defendant also urges the court to exclude from Mr. Munger's fees the time spent preparing plaintiff's voluntary motion to dismiss Smithfield Foods as a defendant in this case (Doc. No. 12) and on reviewing the court's subsequent dismissal. John Morrell argues that this time is unreasonable given that the time spent dismissing Smithfield Foods was a result of Mr. Munger's determination to name Smithfield Foods, John Morrell's parent company, as a defendant only to later determine that it was not a proper defendant. The court will not, however, deduct for time spent preparing the notice of dismissal because it was not unreasonable to name Smithfield Foods as a defendant. Only after contact with John Morrell did Mr. Munger learn that there would be no basis in law or fact to hold Smithfield Foods liable for John Morrell's conduct.

■ John Morrell also contends that the court should reduce Baker's fee request for Mr. Munger's time spent on preparing for and attending the September 13, 2002 pre-trial conference in this case. Pre-trial conferences and adequate preparation for them are integral to the seamless operation of trial. The court does not agree that six hours of preparation, given the importance of the pre-trial conference, is excessive.

■ With respect to hours Mr. Denne expended working on Baker's case, John Morrell first argues that the time spent preparing a resistance to the defendant's summary judgment motion is excessive. Despite the defendant's contention that

Mr. Denne claims 52.5 hours were spent preparing the resistance to the motion for summary judgment, the time entries from May 28, 2001 through June 10, 2002 claim 44.5 hours were spent on the plaintiff's resistance. In any event, the defendant argues that any time in excess of 25 hours is excessive.

In a run-of-the-mill case, the court agrees that 25 hours would probably be sufficient to prepare a resistance to a summary judgment motion. Here, however, the defendant raised several complex factual and legal issues that required response. Furthermore, the plaintiff's resistance was of exceptional quality. Given the complexity of the motion, the number of issues raised, and the quality of the brief and argument, the court finds that 44.5 hours preparation is not unreasonable.

■ John Morrell also challenges as excessive the amount of time Mr. Denne spent preparing and filing the complaint in this case. Mr. Denne spent 7.0 hours performing these tasks, and John Morrell believes that much of this time was necessitated by the fact that the plaintiff initially filed her lawsuit on behalf of a class of similarly situated workers. Because the plaintiff later determined that a class action was not viable, she moved to dismiss the class action portion of her lawsuit. The court granted her motion and dismissed Baker's class action on May 6, 2002. (Doc. No. 43).

The court does not agree with John Morrell's assertion that it should exclude time spent preparing Baker's complaint because plaintiff later moved to dismiss her class action. At the time the complaint was filed, plaintiff's counsel reasonably believed that a class action was a viable and efficient means of addressing the discriminatory atmosphere at John Morrell. In fact, plaintiff's counsel represented four female John Morrell employ-

ees who maintained Title VII lawsuits against John Morrell. Thus, at the time Baker's complaint was filed on January 24, 2001, plaintiff's counsel acted prudently in bringing Baker's lawsuit as a class action under the circumstances as they knew them to be. Based on the facts as they were known to counsel at the time Baker's complaint was filed, the court finds that Baker did not file her class action to secure an unjust private settlement or for any other improper motive. *See Crawford v. Hoffman–La Roche Ltd.*, 267 F.3d 760, 764 (8th Cir.2001). As such, time spent preparing class action allegations, in this case, was not excessive simply because the class action portion of Baker's lawsuit was later dismissed. Furthermore, the court does not agree that much of Mr. Denne's time preparing the complaint was consumed by drafting the class action allegations. Baker's allegations of sexual discrimination were factually complex and dated back several years. The court finds that the time Mr. Denne dedicated to drafting Baker's complaint was reasonable, and the court will not reduce the hours claimed for this work.

 John Morrell also contends that Mr. Denne should not be permitted to charge for time spent attending trial because he did not actively participate. At most, according to John Morrell, Mr. Denne should charge his time at a paralegal rate because his only participation was limited to performing simple administrative tasks, such as "shuttling" witnesses in and out of the courtroom. The plaintiff takes issue with John Morrell's characterization of Mr. Denne's responsibilities at trial. Instead, Baker points out that Mr. Denne prepared and coordinated witnesses and offered suggestions to Mr. Munger about tactical and strategic decisions.

In *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1360 (4th Cir.1995), the Court of Appeals for the Fourth Circuit upheld the district court's reduction of attorney's fees in a Title VII sex discrimination case. Pertinent to John Morrell's argument that Mr. Denne should not be permitted to charge for time attending trial, the *Martin* court held that the district court did not err in concluding that the plaintiff was not entitled to recover fees for three lead counsel at trial. *Id.* The district court acceded to plaintiff's counsel's request to award fees of $200 per hour, but then deducted one attorney's time spent at trial because his role at trial was extremely limited. *See id.* In that case, the attorney who did not actively participate at trial charged $11,000 for time spent attending trial. *Id.* In the end, the district court slashed the claimed attorneys' fees by one-half for overbilling and excessive resources committed to the case by plaintiff's counsel. *Id.*

Baker's case is easily distinguishable from *Martin*. First, Baker's counsel has charged for two attorneys' time in attending trial, not three. The *Martin* court did not hold that it was unreasonable to charge for more than one attorney's time spent at trial. Indeed, it affirmed the district court's reduction of fees for only one of the three attorneys' time at trial. *See id.* Moreover, only Mr. Munger seeks "lead counsel" fees, which the district court in *Martin* reasoned were not warranted when counsel did not actively participate in trial. Mr. Denne's fees are approximately 1/3 less than Mr. Munger's fees, and he has charged for attending only 30.5 hours of the seven-day trial. To prepare for and attend trial, Mr. Munger charged for 84.5 hours, and defendant's lead counsel charged for 89.5 hours.

The court does not agree that Mr. Denne's responsibilities at trial do not warrant entitlement to rates commensurate with his role as an attorney in this case and finds that the hours Mr. Denne expended

at trial were reasonable, especially in light of his role in the litigation. This is not a case like *Martin,* where the attorney whose fees were cut did not actively participate, or like *James v. Norton,* 176 F.Supp.2d 385, 399 (E.D.Pa.2001), where the court reduced fees for time spent at trial by an attorney who did not speak, did not handle a single witness, and made no concrete legal contribution to the case. That Mr. Denne only charged for just over thirty hours of attending trial fully accounts for the role he played in preparing witnesses and assisting Mr. Munger with strategic decisions. The court, therefore, will not reduce the plaintiff's fee request by eliminating Mr. Denne's time at trial.

For the same reasons, the court will overrule defendant's objection to Ms. Collins's charges for attending trial and pre-trial conferences. Again, this case is easily distinguishable from the cases cited by John Morrell, *Martin* and *James.* Ms. Collins clearly played an important role at these conferences and at trial. She took notes, coordinated witnesses, and provided Mr. Munger with input. Moreover, in both *Martin* and *James,* the key to the court's deduction of fees was the fact that plaintiff's counsel committed excessive resources to prosecution of the lawsuit. There is no indication that Baker's counsel are guilty of such overbilling. Here, Ms. Collins's attendance at these proceedings was the polar opposite of overbilling because her fees are substantially less than an attorney's rate, and it would not have been unreasonable for the plaintiff to staff them with two attorneys, such as the defendant did.

Indeed, the overall fee request in this case is extraordinarily reasonable given the complexity of the case, the length of trial, and the numerous motions filed by the defendant, which oftentimes appeared to be nothing more than a war of attrition. Surely, plaintiff's counsel's efficient delega-

tion of work to their experienced paralegal, Ms. Collins, is in part responsible for keeping costs down in this case. This case was hard-fought at every turn in the road, and the reasonableness of the overall fee request illustrates that plaintiff's counsel did not succumb to the pressure of over-litigating Baker's case. The court does not find that the hours charged by Ms. Collins for time spent preparing for and attending trial are unreasonable and will not deduct any of her time from the plaintiff's fee request.

### 4. Partial success

The Supreme Court has explained that "The product of reasonable hours times a reasonable rate does not end the inquiry." *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). After examining the lodestar variables (reasonable hours expended multiplied by reasonable hourly rates), the Supreme Court directs district courts, in cases such as this one, to ask "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* Having concluded that the rates charged by plaintiff's counsel and their staff are reasonable and that a reasonable number of hours were expended on prosecuting Baker's claims, the court turns now to John Morrell's final challenge to Baker's fee request. John Morrell argues that, because Baker prevailed on only two of the three discrimination claims that were submitted to the jury, the court should reduce her fee request by one-third to account for her lack of success on the unsuccessful claim. The plaintiff counters by arguing that, because Baker's claims were inextricably intertwined and involved a common core of facts, she is entitled to shift all of

her attorney's fees without regard to the fact she did not prevail on her disparate treatment claim.

The United States Supreme Court and the Court of Appeals for the Eighth Circuit have squarely addressed the "partial success" argument that the defendant urges the court to adopt here. In *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court reasoned that partial success is not a ground on which to reduce fees if the plaintiff received "excellent results" and the unsuccessful claim cannot easily be segregated from the claims on which the plaintiff prevailed:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." *Davis v. County of Los Angeles,* 1974 WL 180 (C.D.Cal. 1974). The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.
>
> It may well be that cases involving such unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim

basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *See Davis v. County of Los Angeles,* 1974 WL 180 (C.D.Cal.1974). Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Id.* at 434–35, 103 S.Ct. 1933.

The Court of Appeals for the Eighth Circuit has similarly reasoned:

> When a plaintiff has prevailed on some, but not all, of his or her claims, the court should consider the potential impact of partial success on the fee award:

>> If any issues on which the plaintiff lost are unrelated to those on which he [or she] won, the unrelated issues must be treated as if they were separate cases and no fees can be awarded.... If, however, the claims on which the plaintiff lost are related to those on which he [or she] won, the court may award a reasonable fee.... The most important factor in determining what is a reasonable fee is the magnitude of the plaintiff's success in the case as a whole.... If the plaintiff

has won excellent results, he [or she] is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which he [or she] did not win.... If the plaintiff's success is limited, he is entitled only to an amount of fees that is reasonable in relation to the results obtained.

*Jenkins,* 127 F.3d at 716 (citations omitted). However, "[t]here is no precise rule or formula for making these determinations." *Arneson v. Callahan,* 128 F.3d 1243, 1249 (8th Cir.1997) (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933, 76 L.Ed.2d 40). Moreover, we recall that "[b]ecause damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." *City of Riverside v. Rivera,* 477 U.S. 561, 574, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986).

*Wal–Mart Stores, Inc. v. Barton,* 223 F.3d 770, 772–73 (8th Cir.2000) (quoting *Jenkins by Jenkins v. Missouri,* 127 F.3d 709, 718 (8th Cir.1997) (en banc)); *accord Hendrickson v. Branstad,* 934 F.2d 158, 164 (8th Cir.1991) ("A fee award should not be reduced merely because a party did not prevail on every theory raised in the lawsuit.") (citing *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933); *Catlett v. Missouri Highway & Transp. Comm'n,* 828 F.2d 1260, 1270 (8th Cir.1987) (counsel should not be compensated for hours spent pursuing unsuccessful claims that are " 'distinct in all respects' " from the prevailing claims) (quoting *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933).

In this case, the court is exceedingly confident that there was absolutely no "overlawyering" on the part of the plaintiff, and Baker obtained excellent results. A lawsuit such as Baker's, which includes related legal theories based on a common core of facts, should not be viewed as a series of discrete causes of action, and compensation should not be awarded on a claim-by-claim basis. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. In this case, counsel's time was devoted to the litigation as a whole, rather than on specific theories of relief, and compensation should be based on all hours reasonably expended to achieve a successful result.

Moreover, while Baker did not prevail on her disparate treatment claim against John Morrell, the facts she presented to support that claim were also relevant to her hostile work environment and retaliation claims—the claims on which she prevailed. It is of little significance that the jury rejected Baker's disparate treatment claim, particularly given that this claim and the evidence introduced in support of it, helped significantly in proving that John Morrell maintained a hostile work environment. Though short of a Title VII violation on its own, the evidence of disparate treatment contributed to the discriminatory and hostile environment in which the plaintiff worked. Therefore, based on the interrelated nature of the claims against John Morrell, the court will not sustain John Morrell's absurd request to reduce by one-third Baker's fee award for partial success.

To the extent her disparate treatment claim implicated some additional work, despite the fact that John Morrell cannot point to any additional work that Baker's unsuccessful claim entailed, any such additional work was minimal. Assuming her disparate treatment claim entailed some slight additional work discrete from her hostile work environment and retaliation claims, the court will reduce Baker's fee award by one percent to account for her lack of success on the disparate treatment claim. *See Winter v. Cerro Gordo Cty. Conservation Bd.,* 925 F.2d 1069, 1074 (8th

Cir.1991) ("When, however, 'the hours expended are not easily allocable because the unsuccessful and successful claims were related, the court may merely reduce the award in its discretion to an amount reasonable in relation to the result on the merits....' ") (quoting *Catlett,* 828 F.2d at 1270).

### 5. *Calculation of attorney fee award*

Having carefully and thoroughly scrutinized the record in this case, the court is left with the firm conviction that the plaintiff's fee request is extraordinarily reasonable. Mindful that "the most critical factor is the degree of success obtained," *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933, the court concludes that, given the plaintiff's exceptional success, the complexity of the case, and the skill, experience, and reputation of her attorneys, she is entitled to substantially all of the fees she requested. Fees in a case as hard-fought and as well-tried as this one could easily (and reasonably) have been three times as much as Baker's fee request. Moreover, the request is commensurate with the amount of fees awarded to plaintiff's attorneys in similar cases and the amount of fees charged by the defendant's attorneys in this case. *See Warren v. Prejean,* 301 F.3d 893, 904 (8th Cir.2002) (affirming fee award requesting compensation for 825 hours in Title VII case); *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1052 (8th Cir.2002) (affirming $168,551.78 in attorney fees award in employment discrimination action under § 1981); *Kline v. City of Kansas City, Mo., Fire Dep't,* 245 F.3d 707, 709 (8th Cir.2001) (affirming $277,900 in attorney fees to Title VII plaintiff); *Bridges v. Eastman Kodak Co.,* 102 F.3d 56, 58 (2d Cir.1996) (affirming Title VII attorneys' fees of $753,202.99). Therefore, in summary, the court will calculate the plaintiff's fees as follows:

1. Mr. Munger's work: (448.1 hours) × ($275/hour) = $95,727.50

2. Mr. Denne's work: (229.05 hours) × ($175/hour) = $40,083.75

3. Mr. Lessman's work: (28.55 hours) × ($125/hour) = $3,568.75

4. Ms. Collins's work: (325.6 hours) × ($75/hour) = $24,420.00

5. Ms. DeLance's work: (3.45 hours) × ($60/hour) = $207.00

6. Ms. Marvin's work: (3.75 hours) × ($60/hour) = $225.00

The sum total of these fees is $164,232.00. Subtracting 1% from the total for any additional work that plaintiff's unsuccessful disparate treatment claim may have entailed and then adding $609.23 for Baker's former attorney's fee yields an attorney's fee award of $163,198.91, exclusive of costs and expenses, which will be addressed below.

### D. *Recoverable Costs and Expenses*

As part of her fee request, the plaintiff also seeks an award of costs and expenses in this case in the amount of $11,807.23. In cases under Title VII, the trial court has the power to award costs to the prevailing party. *See* 42 U.S.C. § 2000e–5(k). Such awards are controlled by Federal Rule of Civil Procedure 54(d)(1). *See, e.g., Phetosomphone v. Allison Reed Group, Inc.,* 984 F.2d 4, 9 n. 6 (1st Cir.1993); *Washington v. Patlis,* 916 F.2d 1036, 1039–40 (5th Cir.1990) (per curiam); *see also DiSalvo v. Chamber of Commerce of Greater Kansas City,* 568 F.2d 593 (8th Cir.1978) (implicit); *Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50 (8th Cir.1977) (implicit). Rule 54(d) creates a presumption in favor of awarding costs to the prevailing party. *Coyne–Delany, Inc. v. Capital Dev't Bd.,* 717 F.2d 385, 390 (7th Cir.1983). District courts possess wide discretion in determining whether expenses claimed by the prevailing party are actually taxable as costs. *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 345 (7th Cir.1995). Nevertheless, as

the Supreme Court has explained, Rule 54(d) does not give a court "unrestrained discretion to tax costs to reimburse a winning litigant for every expense [she] has seen fit to incur.... [I]tems proposed by winning parties as costs should always be given careful scrutiny." *Farmer v. Arabian Am. Oil Co.*, 379 U.S. 227, 235, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964).

Rule 54(d) works in tandem with 28 U.S.C. § 1920. The taxable costs which may be recovered as specified in 28 U.S.C. § 1920 include: (1) fees of the clerk; (2) fees for transcripts; (3) fees for printing and witnesses; (4) fees for copies of papers "necessarily" used in the case; (5) docketing fees; and (6) compensation of court-appointed experts and interpreters. 28 U.S.C. § 1920. However, 28 U.S.C. § 1920 is not the court's sole source of authority in determining which costs and expenses are recoverable by a prevailing party.

■ Title 42 U.S.C. § 1988(b) provides: "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." Some "costs" that are not available under 28 U.S.C. § 1920 are recoverable as "reasonable out-of-pocket expenses of the kind normally charged to clients by attorneys, and thus should [be] included as part of the reasonable attorney's fees awarded" under 42 U.S.C. § 1988. *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294–95 (8th Cir.1996) (per curiam) (citations omitted); *accord Martin v. City of Indianapolis*, 28 F.Supp.2d 1098, 1107 (S.D.Ind.1998) ("[S]ome of the costs listed by [plaintiff's] counsel, including travel expenses, long-distance telephone calls, photocopying services and express mail charges, are more properly labeled 'litigation expenses,' which generally are com-

pensable as part of a reasonable attorney's fee, rather than costs."), *aff'd*, 192 F.3d 608 (7th Cir.1999) (citing *Pinkham*, 84 F.3d at 294–95); *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1144 (7th Cir.1994); *Bennett v. Central Telephone Co. of Illinois*, 619 F.Supp. 640, 643 n. 1 (N.D.Ill. 1985) ("Such expenses are consistently treated as recoverable as part of 'attorneys' fees' in the broad sense"); *Schultz v. Amick*, 955 F.Supp. 1087, 1116 (N.D.Iowa 1997) (same); *Johnson v. Mortham*, 950 F.Supp. 1117, 1126–1127 & n. 11 (N.D.Fla. 1996) (reasonable costs and allowable expenses of attorney include "reproduction expenses, telephone expenses of the attorney, travel time and expenses of the attorney, and postage"); *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 1992 WL 584077 at * 3 (N.D.Ill. Dec. 21, 1992) (out-of-pocket expenses may include "telecopy charges"); *cf. Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1200 (9th Cir.2002) (recoverable costs under Title VII may include deposition costs), *cert. denied*, —— U.S. ——, 123 S.Ct. 854, 154 L.Ed.2d 781 (2003), (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir.1994)).

■ With regard to the expenses incurred by Baker's counsel's firm, there are certain expenses to which John Morrell does not object and which are recoverable as costs under 28 U.S.C. § 1920 and as allowable expenses under 42 U.S.C. § 1988. There are, however, other charges that are not allowable, and the court will deduct them even though John Morrell did not object. Specifically, the court will deduct plaintiff's charges for "parking fees" because all of the charges were incurred as a result of parking tickets received during trial or were inadequately documented. These tickets total $75.00, and the inadequately documented charge for "mints and parking" totals

$4.00. These fees will not be taxed to John Morrell. Having reviewed the other expenses claimed by Baker's attorneys, the court finds that the amounts charged are reasonable. Turning to the objected-to costs sought by Baker, the court finds that they are properly compensable as part of a reasonable attorney's fee.

First, John Morrell objects to plaintiff's request to recover expert witness costs for the preparation and trial testimony of her treating physicians, Dr. Muller and Dr. Jennings. In John Morrell's opinion, Dr. Muller and Dr. Jennings testified as fact witnesses as Baker's treating physicians, and, therefore, Baker is entitled only to recoup the $40 statutory witness fee provided for under 28 U.S.C. § 1821. Plaintiff counters by pointing out that doctors Muller and Jennings testified as expert witnesses and, accordingly, are entitled to be paid as experts.

First, the court notes that in its motion for new trial, the defendant argued that Dr. Jennings should not have been allowed to offer expert testimony on the issue of the causation of Baker's emotional distress, and the court rejected the defendant's Federal Rule of Evidence 702 argument. Moreover, at trial, John Morrell did not object to Dr. Muller's opinion testimony on the ground it was improper expert testimony. It is clear to the court and was clear to the defendant at the time of trial, at least with respect to Dr. Jennings, that the plaintiff's physicians were offering expert testimony and were not solely testifying as fact witnesses.

Second, the cases the defendant cited in support of its argument are inapposite to Baker's case and do not stand for the proposition that prevailing Title VII plaintiffs are not entitled to recover expert witness fees for testifying physicians simply because the physician-witnesses also served as fact witnesses. *See Demar v. United States*, 199 F.R.D. 617 (N.D.Ill. 2001); *Zanowic v. Ashcroft*, 2002 WL 826878 (S.D.N.Y. Apr. 30, 2002); *Haslett v. Texas Indus., Inc.*, 1999 WL 354227 (N.D.Tex.1999). The underlying cause of action in *Demar* was a personal injury action against the United States and the sole statutory basis for awarding expert fees was Federal Rule of Civil Procedure 26(b)(4)(C). *Demar*, 199 F.R.D. at 617. The issue before the court was whether that rule authorized the plaintiff's treating physician to be compensated as an "expert witness" or whether he should be treated as a "fact witness" and entitled only to the $40 witness attendance fee pursuant to 28 U.S.C. § 1821. *Id.* Rule 26(b)(4)(C) governs compensation of the discovery of expert witnesses and provides:

> Unless manifest injustice would result ... the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision; and [with respect to experts not anticipated to be called at trial] ... to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.

FED. R. CIV. P. 26(b)(4)(C).

Thus, *Demar* does not speak to the availability of expert witness fees available under Title VII. Rule 26 provides that the party seeking to depose an expert witness pay the expert's fees. *See* FED. R. CIV. P. 26(b)(4)(C). Here, Baker has not sought fees for any time spent in deposing Dr. Muller or Dr. Jennings. She seeks reimbursement for their preparation and testimony at trial, where they indisputably provided expert testimony. Perhaps more importantly, in *Demar*, it was undisputed that the physician was being deposed as a fact witness, not as an expert witness. *Demar*, 199 F.R.D. at 618. Here, again,

Baker's physicians were not solely fact witnesses.

In *Haslett,* a case brought under Title VII, the Americans with Disabilities Act, and the Family Medical Leave Act, the parties jointly filed a motion under Federal Rule of Civil Procedure 26 to require reasonable fees and allowances for an expert witness after learning of the exorbitant rates the plaintiff's treating physician intended to charge. *Haslett,* 1999 WL 354227, at *1. The plaintiff designated her treating physician as an expert and was subsequently provided with his fee schedule. *Id.* The physician intended to charge $10,000.00 per day or partial day of trial testimony, $650 per hour for weekend deposition testimony, and $1,000 per hour for weekday deposition testimony. *Id.* The court directed the parties to serve a copy of their motion on the physician and permitted him to file a response because of the effect of the court's order on his compensation. *Id.* The physician did not respond. *Id.*

The court stated that it would compensate the physician at a reasonable rate in excess of the statutory witness rate provided for in 28 U.S.C. § 1821. *Id.* at *2. However, the court was loathe to approve of the outrageous rates charged by the plaintiff's physician without any evidence that those rates were reasonable. *See id.* In the absence of the physician's agreement to charge a reasonable fee for his testimony, the court would not approve of the physician's fee schedule. *Id.* Therefore, the *Haslett* court held that, if the physician failed to agree upon a reasonable fee for his time, the court would order that he testify and be paid at the rates of compensation, travel, and subsistence specified in section 1821. *Id.* Here, plaintiff's physicians' fees are quite modest and, in the court's opinion, reasonable—their combined fees total only $3,090.00. As such, the court is not burdened by the concerns of the *Haslett* court, which was faced with ordering compensation at extremely high hourly rates without the benefit of any evidence touching on the reasonableness of those rates.

In *Zanowic,* an employment discrimination case, the plaintiff sought expert fees for the trial testimony of his treating psychologist. Recognizing that courts in the Second Circuit were split on the issue of whether treating physicians are entitled to a fee beyond the statutory witness fee, the *Zanowic* court ultimately determined that it wanted to steer clear of a "slippery slope" of treating witnesses differently without a legislative directive and held that the plaintiff was not entitled to recover more than the statutory witness fee provided for in 28 U.S.C. § 1841. *Zanowic,* 2002 WL 826878, at * 2. However, the plaintiff in *Zanowic* had failed to disclose the doctor as an expert witness. *Id.* at *1. Here, Baker designated Dr. Jennings and Dr. Muller as expert witnesses several months before trial. (Doc. No. 26). She specifically noted that they would testify as to the causation of her emotional distress. At trial, they indeed offered expert testimony within the meaning of Federal Rule of Evidence 702.

In any event, the court believes that, despite the fact that Baker's treating physicians were not specifically retained for the purpose of offering expert testimony, such testimony would have been necessary in this case because of the importance of establishing the causation of her emotional distress. Not only were Dr. Jennings and Dr. Muller convenient choices to offer their opinions on this matter, their expert testimony substantially furthered the truth-seeking process of trial because of their intimate knowledge of Baker's condition. Given that Title VII provides for expert witness fees and given that the plaintiff would in all likelihood have offered

the substance of Dr. Jennings's and Dr. Muller's testimony regardless of whether the testimony came from her treating physicians or someone retained specifically to testify at trial, the court finds that expert witness fees are allowable in this case. *Compare* P.L. 102–166, *Civil Rights Act of 1991*, H.R. No. 102–40(II) May 17, 1991 ("In response to *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), the Act confirms that Title VII permits prevailing plaintiffs to recover the reasonable costs incurred for experts who assist them in their case."), *with Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (prevailing party's recovery of expert witness fees under 28 U.S.C. § 1920 could not exceed statutory limit).

The court recognizes that there is a split among courts as to whether treating physicians who testify as to matters beyond their first-hand knowledge, *e.g.*, offer opinions as to causation and prognosis, are experts within the meaning of Federal Rule of Evidence 702 and, consequently, whether they are entitled to remuneration in excess of the statutory witness fee. Like many other courts, this court adopts the view that treating physicians should ordinarily be allowed a reasonable fee beyond the $40 statutory limit. *See, e.g., Scheinholtz v. Bridgestone/Firestone, Inc.*, 187 F.R.D. 221, 222 (E.D.Pa.1999) ("reluctantly" approving agreed-upon fee of $600 per hour for treating physician's deposition); *Magee v. Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 645–46 (E.D.N.Y.1997) (finding $250 per hour to be reasonable fee for treating psychiatrist's deposition); *Slywka v. CMI–Equipment & Eng'g, Inc.*, 1997 WL 129378 at *1 (M.D.Pa. Mar. 14, 1997) (finding deposition rate of $300 per hour for treating physician designated as both fact witness and expert witness "generous, and ample to satisfy Rule 26(b)(4)(C)'s 'reasonable fee' require-ment"); *Hose v. Chicago & North Western Transp. Co.*, 154 F.R.D. 222, 225–27 (S.D.Iowa 1994) (finding $400 per hour to be reasonable fee for treating neurologist's deposition).

This court is of the opinion that 42 U.S.C. § 1988(b) authorizes the payment of expert fees sought by the plaintiff even when her expert witnesses also serve as her treating physicians. It is well-settled that section 1988 allows for the recovery of certain costs in addition to the six categories listed in 28 U.S.C. § 1920 because these costs are within the meaning of the term "reasonable attorney's fee." *See, e.g., Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (concluding that " § 1988 permitted separately billed paralegal and law clerk time to be charged to the losing party"). Because expert fees are customarily billed directly to the client even when the expert is also the plaintiff's treating physician, his or her fees should be recoverable within the meaning of "attorney's fee." Here, plaintiff's fee agreement with her counsel anticipates a charge to Baker for such expert testimony. Because expert witness fees are normally charged to clients by attorneys even when the expert is also a treating physician, the court concludes that, when expert testimony is reasonably necessary to the plaintiff's prosecution of her case, expert fees are allowable as "attorney's fees" within the meaning of section 1988.

Moreover, the court finds persuasive the reasoning employed by the United States District Court for the Northern District of Texas in *Haslett*. The *Haslett* court opined that physicians are ordinarily entitled to remuneration in excess of the statutory witness fee:

> Physicians provide invaluable services to the public and should be remunerated for their time when they cannot deliver

medical care. They often have substantial overhead costs that they incur whether they are [t]reating a patient or testifying about one. Litigators and their clients typically obtain physician testimony by deposition rather than by imposing the additional burdens associated with attendance at trial. They also respect the need to compensate physician-witnesses to the extent necessary to cover their overhead costs and to pay them a fee commensurate with their professional standing and special expertise.

*Haslett*, 1999 WL 354227, at * 2.

Having reviewed the charges sought for Drs. Jennings's and Muller's trial testimony and preparation, the court finds that their fees are reasonable and are properly allowable under section 1988. Therefore, the court will overrule the defendant's objection to this portion of the plaintiff's request for costs and expenses and will not deduct Drs. Jennings's and Muller's fees.

█ John Morrell also objects to Baker's Amended and Substituted Supplemental Fee Application (Doc. No. 167) in which she seeks recovery of the cost of the trial transcript. Specifically, Baker seeks $1,272.75 for the cost of obtaining a copy of the trial transcript, and John Morrell argues that she is not entitled to recover this cost because it was not "necessarily obtained for use in the case." John Morrell asserts that Baker did not utilize the transcript during trial or in any of her post-trial motions.

In *McDowell v. Safeway Stores, Inc.*, 758 F.2d 1293 (8th Cir.1985) (per curiam), the case cited by the defendant, the court recognized that the costs of trial transcripts were properly allowable under the taxation of costs statute, 28 U.S.C. § 1920. The court stated, however, that "[b]efore awarding such costs, the court should determine that transcripts were not obtained primarily for the convenience of parties but were necessary for use in the case." *Id.* at 1294 (citing *Galella v. Onassis*, 487 F.2d 986, 999 (2d Cir.1973); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 713 F.2d 128, 133 (5th Cir.1983)). Citing the *McDowell* decision, the Seventh Circuit Court of Appeals articulated this "obtained necessarily for use in the case" standard as follows: "[W]as the [trial transcript] vital to the presentation of the information, or was it merely a convenience or, worse, an extravagance?" *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 429 (7th Cir.2000) (citing *McDowell*, 758 F.2d at 1294).

Scholars, Charles Wright, Arthur Miller, and Mary Kane, similarly explain:

The basic standard applied by the courts in determining whether to allow the expense of a transcript as a taxable cost is whether the transcript was "necessarily obtained for use in the case." This does not mean that the transcript must have been "indispensable" to the litigation to satisfy this test; it simply must have been "necessary" to counsel's effective performance or the court's handling of the case. The transcript may have been procured either for use at the trial or after the trial. But the words "use in the case" in Section 1920 mean that the transcript must have a direct relationship to the determination and result of the trial. Taxation will not be allowed if the transcript was procured primarily for counsel's convenience.

The courts have developed standards under Section 1920(2) that focus on various factors in determining whether a transcript was necessary for use in a particular case and therefore is taxable. These include the length of the trial, the complexity of the issues, whether the transcript would minimize disagreement over the testimony of the witnesses, whether portions of the transcript were

freely introduced in later hearings, whether the case was tried to the court or before a jury, and whether proposed findings of fact were required.

CHARLES ALAN WRIGHT, *et al.*, 10 FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2677, at 438–43 (1998) (footnotes omitted).

In this case, the court concludes that consideration of the applicable standard counsels strongly in favor of awarding the plaintiff the cost of the trial transcript. Due to the length of the trial, the complexity and sheer number of issues argued and raised by John Morrell in its post-trial motions, the court finds that the entire trial transcript was necessary for Baker's effective prosecution of her case, both in the post-trial motions phase and on appeal. In the court's opinion and experience, that Baker did not cite to the transcript in her post-trial pleadings is not determinative of whether or not she utilized the transcript. As the court found in its own consideration of this case, it would have been extremely difficult to respond to many of John Morrell's arguments without access to the trial transcript. The court finds that the transcript was "necessarily obtained for use in the case" and will tax its cost to John Morrell.

### III. CONCLUSION

Having found reinstatement to be impracticable because of John Morrell's demonstrated history of failing to remedy the hostile environment at its plant, Baker's considerable ongoing emotional distress, and the substantial hostility between the parties, the court finds that front pay is an appropriate "make whole" remedy in this case. The court further finds that three years of front pay strikes the proper balance between holding John Morrell responsible for placing Baker in the position in which she finds herself and avoiding unduly speculative front pay awards. This relatively short three-year period also eliminates any penalty, or "subsidy," that

might otherwise be imposed against John Morrell for Baker's decision to enter a career field that has comparable starting wages to production positions but has a markedly lower salary potential.

The court also finds that Baker failed to mitigate her damages when she left her job at Oak Park Care Center without having first secured another job in Sioux City. Therefore, the court calculated the amount of her front pay award using the amount she could have earned at Oak Park Care Center working 40 hours per week. The court finds that, based on Baker's testimony at the post-verdict hearing and on witnesses' trial testimony, Baker would have worked approximately 43 hours per week at John Morrell and would have earned time and one-half wages for all hours over 40 hours per week. Therefore, the court **grants** the plaintiff's **Motion for Amendment of Judgment** to the extent she seeks equitable relief and awards front pay in the amount of $38,921.35, as illustrated in the court's calculations in Section I.B.3 of this Order.

The court also **grants** plaintiff's **Application for Attorney's Fees.** The fees requested in this case are incredibly modest, not only in light of the complex nature of the case but particularly in light of the "take no prisoners" approach taken by the defendant in this case. Given the myriad of issues and petty objections that the plaintiff was forced to resist throughout the pendency of this case, her counsel's fees reasonably could have been several times the amount that she has requested. While there is ample evidence of the "no holds barred" approach taken by defendant's counsel in this case, the most striking example occurred at trial. Lead counsel for John Morrell made more objections than any other lawyer I have ever encountered in any of my previous trials combined, and I have been a federal trial court

judge for nearly nine years. Moreover, the court is troubled by the defendant's position on Baker's attorney's fee request when it was John Morrell's endless flow of motions that necessitated much of the work in this case and when John Morrell's own fees are much more reflective of what Baker's counsel's fees reasonably could have been.

In any event, the court finds that the rates claimed and the hours expended by plaintiff's counsel are reasonable, and the court will only deduct a nominal 1% from the lodestar amount to account for lack of success and duplication of effort. Anything more would penalize plaintiff's counsel for utilizing their resources so efficiently.

For the reasons stated above, the court awards attorney's fees in the amount of $163,198.91 and costs and expenses in the amount of $11,728.23.[20]

**IT IS SO ORDERED.**

---

**20.** The court's award of costs and expenses as part of Baker's fee application renders moot Baker's Bill of Costs (Doc. No. 124).